Death Opinion



 
 



 




 


IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,494






LICHO ESCAMILLA, Appellant



v.



THE STATE OF TEXAS






ON DIRECT APPEAL


FROM DALLAS COUNTY






 Hervey, J., delivered the opinion of the Court in which Keller, PJ., Meyers,
Womack, Keasler, Holcomb and Cochran, JJ., joined. Price and Johnson, JJ., concurred.


O P I N I O N




 A jury convicted appellant of capital murder. The trial court sentenced appellant to death pursuant
to the jury's answers to the special issues submitted at the punishment phase. Appellant raises thirty-one
points of error. We affirm.

 The indictment alleged that appellant shot and killed a peace officer who was "then and there acting
in the lawful discharge of an official duty, and the said [appellant] then and there knew the said deceased
to be a peace officer." See § 19.03(a)(1), Tex.Pen.Code. Appellant claims that the evidence is legally
insufficient (point of error five) and factually insufficient (point of error six) to support a finding that he knew
the victim was a peace officer when appellant killed him.

 In a legal sufficiency review, we view all of the evidence in the light most favorable to the verdict
and then determine whether a rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt. See Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). In a factual
sufficiency review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the
evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so
strong that the standard of proof beyond a reasonable doubt could not have been met. See Zuniga v.
State, S.W.3d slip op. at 8 (Tex.Cr.App. No. 539-02, delivered April 21, 2004).

 The evidence shows that the victim was one of four off-duty Dallas police officers working extra
jobs at a nightclub. The 19-year-old appellant shot and killed the victim and wounded one of the other off-duty police officers (who survived the shooting) outside the club. An employee of the club (Bravo) testified
that two "cops" were approaching the scene of a fight at the parking valet station in front of the club when
the shooting started.

 Q. [PROSECUTION]: And, go ahead and tell the jury what you remember from there?


 A. [BRAVO]: Well, then after that, all of the fighting and whatever. Then, the cops were
like on their way to help.


 Q. The cops were on their way to help, is that what you said?


 A. Yes.


 Q. All right. Go ahead?


 A. And, well, as soon as, well, they didn't even get the chance to get to the guy, when the
guy just bring out a gun and started shooting.


 Q. And, what happens then?


 A. Well, it sounded like the first cop got shot, then the [victim]. The shooting just like keep
going on and on. Then the guy tried to took [sic] off and he stopped like midway where
[the victim] was on the floor. He was like, shoot him a couple of times, and then just took
off, and a couple of cops-a couple of policemen just followed him.


 A valet parking employee (Gonzales) testified that appellant shot two uniformed police officers as
they were approaching the scene of the disturbance at the parking valet station. Gonzales testified that he
could tell they were police officers.

 Q. [PROSECUTION]: And, then what happened?


 A.[GONZALES]: When I turned around, I saw two police officers coming and [appellant]
fired at them.


 Q. And, the two persons that you saw coming, you could tell that they were police officers;
is that right?


 A. Yes.


 Q. And, where did you see the two police officers coming from?


 A. Further away in front of where we were at.


 Q. Could you take your pointer and point to the area that you first saw the two police
officers on State's Exhibit 10?


 A. Yes.


 Q. Go ahead, please?


 A. (Witness did as requested.)


 Q. And, you are pointing to an area that looks like it is on the driveway area, pretty close
to the front of Club DMX-the front porch of DMX; is that right?


 A. Yes.


 Q. And, they were in uniform?


 A. Yes.


 The off-duty police officer who was wounded in the shooting (Lockett) testified that he was walking
toward a disturbance (which he described as a breach of the peace) in the valet parking area when the
shooting started.

 Q. [PROSECUTION]: Please, tell the jury what it is that you recall seeing?


 A. [LOCKETT]: Okay. At that time, I was standing there. They,-the disturbance was
in the valet area. And, I started walking toward where I thought this disturbance was. 
And, as I was walking over there, the people that's in the valet area, as I last recall, three
Latin males and one Latin male running away, or several Latin males that were running
toward me, I see these, at this time, three Latin males trying to attack this one Latin male. 
And, I grabbed the one Latin male from behind, and as I am pulling him to the ground, we
fall to the ground and we begin to struggle as I hear gunfire. And, as I hear gunfire, the
next thing I know I am shot and on the ground. I am shot in my left wrist and the bullet
goes from my left wrist into the palm of my hand. And that is basically the last thing that
I remember.


 Lockett also testified that his and the victim's clothing "clearly identified" them as police officers.

 Q. [PROSECUTION]: All right. Do you remember if November the 24th, Saturday, at
2001, was a rather cold evening?


 A. [LOCKETT]: Yeah, it was chilly. I think we had like skull caps or a wool cap with
Dallas PD emblem and the black jackets with the Dallas Police emblem on the chest and
the police emblem on my left side.


 Q. And, you were wearing such a jacket on that occasion?


 A. Yes.


 Q. And, was [the victim] also wearing a police jacket just like you described, as best as
you can recall?


 A. Yes, as best as I can recall, I think he was also wearing a jacket.


 Q. And, were you both clearly identified as Dallas Police Officers?


 A. Yes, we were.


 A police officer (Rivera), who arrived at the club soon after the shooting, testified that he
unbuttoned the victim's "uniform shirt" and ballistic vest to perform CPR on the victim.

 Q. [PROSECUTION]: When you were ministering to him, did I understand you to say
that in order to do the CPR, you had to unbutton some of his clothing and to do something
with some of the apparel that he was wearing?


 A. [RIVERA]: Yes, sir. I unbuttoned his uniform shirt, unbuckled the front of his Sam
Brown Belt. He was wearing his ballistic vest. There are velcro straps that come to the
front. And, basically, I pulled the straps out and removed the front panel, so that-we can
work on him medically.

 

 The evidence also shows that, soon after the shootings at the club, appellant was arrested and
transported to a hospital because he suffered a minor gunshot wound in an exchange of gunfire with one
of the other off-duty police officers. Several witnesses at the hospital heard appellant commenting about
how he had shot a "faggot cop." For example, a police officer (Hay), who accompanied appellant to the
hospital, testified:

 Q. [PROSECUTION]: And, what happens as far as he is concerned that you recall there?


 A. [HAY]: Once we were in the actual trauma room, the doctor asked him, if he knew
where he was at. And, he replied, I am at Parkland because I shot a faggot cop.


 Q. And, what then occurs after that, that you recall?


 A. He made several more statements along those lines. He repeated that phrase several
times. I recall, that after the attending physicians conducted their initial examination and
the nurses started to file out to get-to do their business, he looked at myself and another
Officer, Joe Allen, and started laughing and said, yeah, yeah, mother fuckers, I thought I
was invincible like that cop thought he was, but I guess, I am not. And, then he made
another statement and was laughing and said that he would be-he said, yeah, mother
fucker, I will be out of here in forty-eight hours.


 Q. And, the words that you are telling the jury right now are your recollection, not of your
language, but of the language that he used.


 A. That is correct.


 Appellant later admitted during a videotaped interview with a television reporter that he knew he
was shooting at a police officer.

 Q. [GILLETT]: Now, you've, you've told me already you knew you were shooting at a
police officer-the first one...


 A. [APPELLANT]: Yeah.


 Q. ...so there's no question that you knew you were shooting at a police officer the first
time.


 A. Yeah.


 Q. You think you killed him?


 A. Yeah. Hell yeah. I killed that MF.


 The only piece of the victim's clothing that was introduced into evidence was the victim's jacket. 
The State's brief describes it as the victim's "uniform jacket," but it is literally described in the reporter's
record as the victim's "jacket."

 Q. [PROSECUTION]: I am showing you an item now, Detective Vineyard, and ask you
to examine that, which is marked State's Exhibit 24?


 A. [VINEYARD]: (Witness did as requested.) Do you want to go ahead and take it out?


 Q. Yes, sir, if you would, please.


 A. This is the jacket that [the victim] was wearing that evening, removed at the hospital.


 Q. And, if the court please, we will have the jacket itself marked as State's Exhibit 24 and
offer it into evidence and not the paper that had contained it?


 [THE COURT]: Any objection?


 [THE DEFENSE]: No objection, Your Honor.


 [THE COURT]: State's Exhibit 24 is admitted.


 The record also reflects that, during closing jury arguments, the State referred to police insignias
on this jacket.

 I don't know if you can see here, but, this is the jacket that was introduced into evidence. 
This is the jacket that [the victim] wore on that occasion. And, you can see, if you look
at it, you can see the insignia of the Dallas Police Department both on the chest, as well as,
on the side of the shoulder. The jacket doesn't look the same now as it did when he drove
in with it, because of what is to happen to him and because of the wounds that are to be
inflicted to him and then, those wounds and the holes in that jacket then, analyze
subsequently by the Southwestern Institute of Forensic Sciences. But, let there be no
mistake that the jacket he is wearing clearly identifies him as a Dallas Police Officer. And,
this exact type of jacket is the jacket that the other three officers are wearing.


 Appellant claimed during closing jury arguments that he was not guilty of capital murder because
the State presented no evidence that the victim was performing an "official duty." But see Moore v. State,
999 S.W.2d 385, 403-04 (Tex.Cr.App. 1999), cert. denied, 120 S.Ct. 2220 (2000) (off-duty police
officer who intervened in commission of a burglary was acting in his official capacity as a police officer). 
Appellant claims on appeal, however, that the State presented no evidence that appellant knew the victim
was a police officer when appellant killed him.

 In support of this claim, appellant argues that none of the testifying officers positively stated that the
victim was wearing a police uniform or anything identifying him as a police officer. Appellant argues that
Rivera's testimony that he unbuttoned the victim's "shirt" and removed the front panel of his ballistic vest
"is the only positive description of the [victim's] clothing" and that this "fails to show that there were any
identifying markings on the shirt that would have led Appellant to believe he was shooting at a police
officer." Appellant further argues that his statements at the hospital about shooting a "faggot cop" have no
probative value because "Appellant could have learned of the identity of the victim during his arrest."

 Contrary to appellant's characterization of Rivera's testimony, Rivera testified that he unbuttoned
the victim's "uniform shirt." Lockett testified that the victim's clothing "clearly identified" him as a police
officer. The valet parking employee (Gonzales) testified that the officers appellant shot were in "uniform." 
Appellant admitted during the interview with the television reporter that he knew the victim was a police
officer when he killed him. Appellant's statements at the hospital also reasonably support an inference that
appellant knew the victim was a police officer when appellant killed him particularly since there is no
contrary, affirmative evidence in this record that appellant "learned of the identity of the victim during his
arrest." See Lacour v. State, 8 S.W.3d 670, 671 (Tex.Cr.App. 2000) (legal sufficiency appellate
standard of review meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable
inferences from basic facts to ultimate facts"); Zuniga, slip op. at 8.

 The jury's verdict in this case is not irrational, or clearly wrong and manifestly unjust, or contrary
to evidence so strong that the standard of proof beyond a reasonable doubt could not have been met. 
Points of error five and six are overruled.

 In points of error one through four appellant claims that the trial court denied his challenges for
cause to veniremembers Denton (point of error one), Medley (point of error two), Overton (point of error
three) and Fletcher (point of error four). Harm from the erroneous denial of a defense challenge for cause
occurs (1) when a defendant exercises a peremptory challenge on a veniremember whom the trial court
erroneously failed to excuse for cause at the defendant's request, (2) the defendant uses all of his statutorily
allotted peremptory challenges, and (3) the defendant was denied a request for an additional peremptory
challenge which he claims he would use on another veniremember whom the defendant identifies as
"objectionable" and who actually sits on the jury. See Johnson v. State, 43 S.W.2d 1, 5-6 (Tex.Cr.App.
2001), following Wolfe v. State, 178 S.W.2d 274, 280-81 (Tex.Cr.App. 1944) (op. on reh'g).

 When these conditions are met, we have stated that this harms a defendant because he had to use
a peremptory challenge to remove a veniremember who should have been removed for cause which has
the effect of wrongfully depriving the defendant of one of his statutory peremptory challenges. See
Johnson, 43 S.W.3d at 6; Wolfe, 178 S.W.2d at 281. When these conditions are met and a defendant
has been granted additional peremptory challenges, he must also show that the trial court erroneously
denied a number of defense challenges for cause equal to at least one more than the additional peremptory
challenges in order to show that he was wrongfully "deprived" of "the use of at least one of his allotted
peremptory challenges." See Feldman v. State, 71 S.W.3d 738, 744, 748 (Tex.Cr.App. 2002);
Martinez v. State, 763 S.W.2d 413, 415 (Tex.Cr.App. 1988). For example, if the defendant receives
three additional peremptory challenges, he must show that the trial court erroneously denied his challenges
for cause to at least four veniremembers. See Feldman, 71 S.W.3d at 744.

 The record in this case reflects that appellant exercised peremptory challenges on Denton, Medley
and Overton after the trial court had denied his challenges for cause to them. The record also reflects that
the trial court granted appellant three additional peremptory challenges. Both parties assert in their briefs
that appellant challenged Fletcher for cause. Our review of the record, however, reflects that appellant did
not challenge Fletcher for cause and that appellant (who was out of peremptory challenges) identified
Fletcher as an "unacceptable" juror after the trial court had denied appellant's request for a fourth
additional peremptory challenge which he apparently would have used to remove Fletcher who became
the twelfth juror.

 [THE COURT]: Does the State have any challenge for cause on juror number eight
seventy-four, Mollie Fletcher?


 [PROSECUTION]: No, Your Honor.


 [THE COURT]: Does the Defense?


 [DEFENSE]: No, Your Honor.


 [THE COURT]: What says the State?


 [PROSECUTION]: The State will accept Ms. Fletcher.


 [THE COURT]: What says the Defense?


 [DEFENSE]: Your Honor, we would show the Court that Ms. Fletcher, it would be a
juror unacceptable to the Defense for the reason that she does not have a consideration
of mitigation. In fact, on her questionnaire, she said that each person is responsible for
their own actions and, her answer under questioning, her concept of mitigation, although,
she couldn't think of it, the only thing she could think of was, would involve self-defense
or accident. And, the fact, that she in the past, worked for the City of Dallas and as a
police dispatcher and due to the reason that she is not acceptable to the Defense, we ask
for an additional challenge to challenge juror eight seventy-four, Mollie Fletcher.


 [THE COURT]: Court denies your request for an additional peremptory challenge.


 Appellant, therefore, failed to preserve any error on whether Fletcher was challengeable for cause. (1) 
See Sells v. State, 121 S.W.3d 748, 758 (Tex.Cr.App.), cert. denied, 124 S.Ct. 511 (2003) (to preserve
error on denied defense challenges for cause, defendant must demonstrate that he "asserted a clear and
specific challenge for cause); Mayo v. State, 4 S.W.3d 9, 12 (Tex.Cr.App. 1999) (requirement that juror
be county citizen is forfeited by failure to assert that as basis for challenge for cause); see also Johnson,
43 S.W.3d at 5 n.6 (discussing past confusion of "preservation of error and harm issues within the context
of an erroneous denial of a challenge for cause"). Under these circumstances, he cannot show harm from
the denial of his challenges for cause to the other three veniremembers since he received three additional
peremptory challenges. See Feldman, 71 S.W.3d at 744, 748; Martinez, 763 S.W.2d at 415. Points
of error one through four are overruled.

 In points of error seven and eight, appellant claims that the trial court erroneously denied his motion
to suppress a custodial videotaped interview that he gave to a television reporter about two days after his
arrest. We understand appellant to claim that the admission into evidence of portions of this custodial
interview at the guilt/innocence and punishment phases of his trial violated the Sixth Amendment to the
United States Constitution and Article 38.22, Tex. Code Crim. Proc., (2) because the reporter was a "state
agent" when he conducted the interview. See Miranda v. Arizona, 86 S.Ct. 1602, 1612 (1966) (defining
"custodial interrogation" as questioning initiated by the police after a person has been arrested); Paez v.
State, 681 S.W.2d 34, 36-37 (Tex.Cr.App. 1984) (Article 38.22 does not apply to non-law enforcement
personnel who are not state agents).

 The evidence from the suppression hearing shows that the police followed their established practice
when they permitted the reporter to interview appellant in jail after appellant consented to the interview in
response to a request by the reporter. Appellant claims that the reporter became a "state agent" when,
after appellant consented to the interview but before the interview occurred, a Dallas police officer called
the reporter and, according to appellant, "asked [the reporter] to get [appellant] to talk because [appellant]
would not talk to the police."

 This assertion, however, suggests something that is out of context with the entire conversation
between the officer and the reporter and a full reading of the record. The record from the suppression
hearing reflects:

 Q. [PROSECUTION]: Now, between the time that the interview was set and the time that
you conducted the interview, did you have any conversations with any law enforcement
officers?


 A. [GILLETT, THE REPORTER]: Yes, sir, I did.


 Q. Who was that?


 A. Sergeant Joe Decorte, the Sergeant from the Special investigative Unit of the Dallas
Police Department.


 Q. And, when did you talk to him, do you recall?


 A. Sometime after I learned that I had the okay to do the interview with [appellant], but
before the actual interview.


 Q. And, what was that conversation, to the best of your recollection?


 A. I was very uncomfortable getting a phone call that near the time of the-of the interview. 
I thought that he was going to attempt to-was going to tell me that they had found a reason
for him not to talk to me. There was-had been a lid on things the day before. I don't
know why, we just-there were road blocks in terms of public information that I hadn't
seen routinely and I was afraid that he was going to put a road block to the interview.


 Q. And, what did he say?


 A. I asked him, are you going to try to block me. And, he said, well no, I want you to get
him to talk. He won't talk to me. Words to that. That's not quote, that's, you know,
what my recollection, my impression of what he said.


 Q. All right. What else was said, if you recall, during your conversation with him.


 A. That's all. I was uncomfortable taking the phone call.


 Q. The remark that was made, how did you review that remark by him, that I hope you
get him to talk or whatever the words were that he used?


 A. I thought he was, you know, I was still sensitive about thinking he was going to try to
block the interview. And, he said, like a laugh, a throw away, you know, he won't talk to
me so, maybe, you know, maybe you can get him to confess, something like that.


 Q. And, you don't recall the exact words he used, is that correct?


 A. No, that is my recollection, is he said, he chuckled and said, hell, no, I want you to get him to
confess, he won't talk to me.


 Q. Did you just-


 A. But, he did it in a laughing way. It was not a direct order or anything.


 Q. And, that was my next question. Did you take that comment by him as any kind of
directions to you as to what you should do?


 A. No, sir, absolutely not.


 Q. And, was it more in the nature of just an off the cuff remark by him?


 A. That's correct, it was.


 Q. And, in terms of the questions that you were going to ask for the interview, were they
your questions?


 A. Yes, sir, absolutely.


 Q. Did anyone tell you what to ask or direct you to ask questions in any certain way?


 A. No, sir.


 This record clearly does not present the scenario where the police employ an informant to
deliberately elicit incriminating statements from an in-custody defendant solely for the purpose of helping
the police gather evidence against the defendant. See generally State v. Hernandez, 842 S.W.2d 306,
312-16 (Tex.App.-San Antonio 1992, pet. ref'd), cert. denied, 113 S.Ct. 3049 (1993) (thorough
discussion of how non-law enforcement personnel can become state agents for Sixth Amendment
purposes). In this case, the record supports a finding that the officer expressed to the reporter a hope that
appellant would incriminate himself during the interview with the reporter. This was not an offer to the
reporter to act as a state agent and did not convert an otherwise legal interview into an illegal one. See
Hernandez, 842 S.W.2d at 314 (creation of an agency between law enforcement and non-law
enforcement personnel depends upon the existence of an agreement between them at the time of the
elicitation). Even if this was an offer by the police to the reporter to become a state agent, there is no
evidence to support a finding that the reporter accepted this offer. See id. On this record, we cannot
conclude that the reporter was acting as a state agent when he interviewed appellant. (3) Points of error seven
and eight are overruled. 

 In point of error nine, appellant claims that the trial court erred "in allowing the oral statements of
[appellant] to law enforcement personnel while in custody." Dallas police officer Hay testified at
guilt/innocence to oral statements he heard appellant make soon after appellant killed the victim. The
statements at issue here are: (1) appellant's spontaneous statement to Hay "why didn't you mother fuckers
kill me, I just wanted you to kill me" while appellant was being transported in an ambulance from the scene
of his arrest to the hospital, and (2) appellant's statement, "I am at Parkland [Hospital] because I shot a
faggot cop" in response to a doctor's question to him in the hospital asking appellant if he knew where he
was. Appellant claims that the admission of this evidence violated Article 38.22 and the Fifth and Sixth
Amendments to the United States Constitution.

 Appellant claims in point of error ten that the trial court erroneously admitted into evidence
appellant's custodial oral statements to hospital personnel who were treating appellant's injuries. Appellant
claims that they were state agents. Appellant also claims that "the probative value did not outweigh the
prejudicial effect of this evidence" under Tex.R.Evid. 403. The statements at issue here are: (1) a
paramedic's testimony that he heard appellant say in the hospital, "Yeah, I shot that faggot cop," (2) a
nurse's testimony that she heard appellant say in the hospital "Yes, I shot that faggot cop," and (3) another
nurse's testimony that she heard appellant laughingly say in the hospital, "I killed that mother fucker." 

 These statements were not the result of "interrogation" by law enforcement personnel or their
agents. See Miranda, 86 S.Ct. at 1612 (defining "custodial interrogation" as questioning initiated by the
police after a person has been arrested); Paez, 681 S.W.2d at 36-37 (Article 38.22 does not apply to
non-law enforcement personnel who are not state agents). In addition, the trial court did not abuse its
discretion to determine that the probative value of appellant's statements was not substantially outweighed
by the danger of unfair prejudice since they were probative of appellant's intent and of whether appellant
knew that the victim was a police officer when he killed him. Points of error nine and ten are overruled.

 In point of error eleven, appellant claims that the trial court erroneously admitted into evidence nine
(possibly ten) (4) autopsy photographs of the victim. Appellant argues that the probative value of this
evidence was "far outweighed" by its "prejudicial effect" under Rule 403.

 At trial, appellant claimed that the probative value of State's Exhibits 131-140 was "greatly
outweighed by the prejudicial impact" on the jury. The prosecution responded that out of many autopsy
photographs he had selected a few that would most aid the medical examiner "in her testimony, as well as,
aid the jury." The medical examiner informed the trial court that the photographs were "necessary and
represent[ed] the injuries that were seen at the time of the autopsy." Applying the actual standard set out
in Rule 403, the trial court overruled appellant's objection after finding that the probative value of the
photographs was "not substantially outweighed by the danger of unfair prejudice."

 [THE COURT]: And, for the record, Mr. Tokoly, are there other autopsy photographs?


 [THE PROSECUTION]: Yes, Your Honor, there are.


 [THE COURT]: And, how many of them are there?


 [THE PROSECUTION]: I would have to go and make account of the rest of those. 
There are a considerable number more than the ones that I have selected for offering
before the jury. If the Court wants me to, I can do that?


 [THE COURT]: No. No, I am just really trying to find out if you've gone through all of
the autopsy photos and determined which ones show the wounds-the different wounds
that she's described?


 [THE PROSECUTION]: I have, Your Honor, to the best of my knowledge and
recollection. And, I have selected those that the Court has before her, as being the most
representative of the wounds that they seek to show. And, as well, that I believe that they
explain those wounds in a way that will aid the Doctor most in her testimony, as well as,
aid the jury. And so, I have gone through a selection process with a view toward doing
that, as well as, their relevance.


 [THE COURT]: And, Dr. Urban, you've gone through and looked at State's Exhibit 131
and through 140, is that correct?


 [MEDICAL EXAMINER]: Yes.


 [THE COURT]: And, is there any photograph among these that is duplicitas [sic] of
another photograph of these?


 [MEDICAL EXAMINER]: I think they are all necessary and represent the injuries that
were seen at the time of the autopsy.


 [THE COURT]: Mr. Huff, your objections to State's Exhibits 131 through 140 are
overruled. The Court finds that the probative value of State's Exhibits 131 through 140
is not substantially outweighed by the danger of unfair prejudice. Therefore, the Court
overrules your objection.

 

 The record further reflects that the medical examiner used the photographs to explain her testimony. 
For example,

 Q. [PROSECUTION]: Now, with regard to State's Exhibit 131, can you see that, Dr.
Urban?


 A. [THE MEDICAL EXAMINER]: Yes.


 Q. And, can you tell the jury what State's Exhibit 131 portrays?


 A. This is an overall photograph showing the upper half of the victim's body. And in
particular, in this photograph you can see the first two gunshot wounds that I described. 
Mainly, gunshot wounds number one and number two.


 Q. All right. And, can you point to those on State's Exhibit 131, please?


 A. They are seen here.

 

 The trial court did not abuse its discretion to admit the autopsy photographs because they helped
explain the medical examiner's testimony describing the victim's various wounds for which appellant is
responsible. See Newbury v. State, S.W.3d slip op. at 31 (Tex.Cr.App. No. 74,308, delivered
April 21, 2004). Point of error eleven is overruled.

 In point of error twelve, appellant claims that "the trial court erred in allowing the State to present
evidence of extraneous offenses that were not proved beyond a reasonable doubt in the punishment stage
of trial." In his brief, appellant asserts that he objected to evidence of extraneous offenses in part because
this evidence "would not be proved beyond a reasonable doubt." The record, however, does not support
this assertion. It reflects that appellant made the following objection to the introduction of extraneous
offenses.

 [THE DEFENSE]: Your Honor, with regard to the certified copies and to the proper
extraneous offenses, the Defense makes the following objections. First of all, to the extent
that any of these extraneous offenses include offenses which may have occurred when the
Defendant was a juvenile, that is under the age of seventeen. We object for the reason,
that the introduction into evidence of juvenile offenses violate our client's right to Due
Process of Law pursuant to the Equal Protection Clause-pursuant to the Due Process and
Equal Protection Laws of the United States Constitution and the Due Course of Law
Provisions of the Constitution of the State of Texas. In addition, we would object to any
of the offenses offered for which there has not been a final judgment, for the reason that
such offenses have not been proved in a court of law and the introduction into evidence of
such offenses at this stage of the trial, even if the court were to instruct the jury that they
have to be proved beyond a reasonable doubt, would cause the Defendant to be denied
Due Process of Law pursuant to the United States Constitution. And in addition, it would
deprive the Defendant of Due Course of Law pursuant to the Constitution of the State of
Texas. We further would object to any of the offenses that maybe [sic] admitted by the
State to the extent they do not show, that they do not reflect upon any special issue that
should be answered by the jury. Particularly, with regard to the unauthorized use of a
motor vehicle, the evading arrest and the high speed chase. We submit to the Court, that
such offenses bear little relevance, if any, to the first special issue of potential future
dangerousness and that they are not acts of violence. And, that the probative value of such
offenses is greatly outweighed by the prejudicial effect, the introduction of such offenses
would have on the jury. And, this would be-this would be to such an extent that it would
be a Due Process violation under the Fourteenth Amendment to the United State's [sic]
Constitution and the Due Course of Law Provisions of the State of Texas. And, for all
these reasons, we object to the introduction of these extraneous offenses, Your Honor.


 [THE COURT]: Your objections are overruled. The court finds that the probative value
of this proffer-the evidence as stated by [the State] in his proffer, it is not substantially
outweighed by the prejudicial effect, and the Court will admit the same.

 

 We will assume that appellant preserved the claim that he asserts on appeal. This Court's
assessment of the record from the punishment phase reflects that the State "clearly proved," through
certified court records and live testimony, appellant's commission of various adjudicated and unadjudicated
extraneous offenses dating back to when appellant was a juvenile. See Hughes v. State, 24 S.W.3d 833,
843 (Tex.Cr.App), cert. denied, 121 S.Ct. 430 (2000) (when at punishment phase of capital murder trial
the state relies on evidence of defendant's commission of extraneous offenses, state must "clearly prove"
that the defendant committed these extraneous offenses). Point of error twelve is overruled.

 In point of error thirteen, appellant claims that "the trial court erred in allowing the State to use the
juvenile records against appellant as a violation of due process and equal protection." This did not violate
due process or equal protection principles. See Corwin v. State, 870 S.W.2d 23, 36-37 (Tex.Cr.App.
1993), cert. denied, 115 S.Ct. 95 (1994) (use of juvenile misconduct as aggravating factor in capital
punishment proceeding did not violate due process or Eighth Amendment principles). Point of error
thirteen is overruled.

 In point of error fourteen, appellant claims that "the trial court erred in overruling appellant's motion
to exclude evidence of unadjudicated extraneous offenses at the punishment stage of the trial." Appellant
claims that well-settled jurisprudence upholding the admissibility of this evidence at a capital sentencing
proceeding "has done so without an analysis of the proclauses of both the state and federal constitutions." 
See, e.g., Hughes, 24 S.W.3d at 842; Corwin, 870 S.W.2d at 36 n.18; Milton v. State, 599 S.W.2d
824, 827 (Tex.Cr.App. 1980), cert. denied, 101 S.Ct. 3022 (1981). In support of this claim, appellant
relies on a United States Supreme Court decision on the admissibility of victim-impact evidence, (5) which
the United States Supreme Court has since overruled. (6) We decline to revisit well-settled jurisprudence
upholding the admissibility of evidence of unadjudicated extraneous offenses at a capital sentencing
proceeding. Point of error fourteen is overruled.

 In point of error fifteen, appellant claims that the death penalty has been unconstitutionally imposed
upon him in violation of the United States Supreme Court's decision in Atkins v. Virginia because the
State made no affirmative showing that appellant is not mentally retarded. See Atkins v. Virginia, 122
S.Ct. 2242, 2247-52 (2002) (Eighth Amendment prohibits execution of mentally retarded people). 
Neither Atkins nor our case-law applying it require the State to affirmatively show that a capital murder
defendant is not mentally retarded. See generally id.; Ex parte Briseno, S.W.3d (Tex.Cr.App., No.
29,819-03, delivered February 11, 2004). Point of error fifteen is overruled.

 In points of error sixteen, twenty-three, twenty-four, and twenty-seven, appellant claims that Texas
death-penalty law violates the state and federal constitutions because it simultaneously restricts and allows
unlimited or "open-ended" juror discretion to impose the death penalty. In support of these claims,
appellant relies on, and quotes extensively from, former Justice Blackmun's dissenting opinion in Callins
v. Collins, 114 S.Ct. 1128-38 (1994) (Blackmun, J., dissenting). This Court has rejected these claims. 
See Turner v. State, 87 S.W.3d 111, 118 (Tex.Cr.App. 2002), cert. denied, 123 S.Ct. 1760 (2003);
Callins, 114 S.Ct. at 1127-28 (Scalia, J., concurring). Points of error sixteen, twenty-three and twenty-four are overruled.

 In point of error seventeen, appellant claims that Texas death-penalty law violates the Supreme
Court's decision in Penry v. Johnson because "the mitigation special issue sends mixed signals to the jury
thereby rendering any verdict reached in response to that special issue intolerable and unreliable." See
generally Penry v. Johnson, 121 S.Ct. 1910 (2001) (Penry II). This Court has rejected this claim. See
Jones v. State, 119 S.W.3d 766, 790 (Tex.Cr.App. 2003). Point of error seventeen is overruled.

 In points of error eighteen, nineteen, and twenty, appellant claims that Texas death-penalty law
violates the state and federal constitutions because it implicitly puts the burden on appellant to prove the
mitigation special issue rather than "requiring the State to prove the absence of sufficient mitigating
circumstances beyond a reasonable doubt." In point of error twenty-six, appellant claims that Texas death-penalty law violates various federal constitutional provisions because it fails to place the burden of proof
on the State "regarding aggravating evidence" in the mitigation special issue. This Court has rejected these
claims. See Blue v. State, 125 S.W.3d 491, 500-01 (Tex.Cr.App. 2003) (neither party bears the burden
of proof at punishment on the mitigating evidence special issue). Points of error eighteen through twenty
and twenty-six are overruled.

 In point of error twenty-one, appellant claims that the "12/10" rule violates various federal
constitutional provisions. This Court has rejected this claim. See Blue, 125 S.W.3d at 505; Turner, 87
S.W.3d at 118. Point of error twenty-one is overruled.

 In point of error twenty-two, appellant claims that Texas death-penalty law violates various federal
constitutional provisions by failing to define the terms "probability," "continuing threat to society," and
"criminal acts of violence." This Court has rejected these claims. See id.

 In point of error twenty-five, appellant claims that Texas death-penalty law is unconstitutional
because it "fails to require the issue of mitigation be considered by the jury." Appellant seems to argue that
Texas death-penalty law is unconstitutional because it does not "mandate consideration of mitigating
evidence." We have rejected this claim. See McFarland v. State, 928 S.W.2d 482, 497-98
(Tex.Cr.App. 1996), cert. denied, 117 S.Ct. 966 (1997) (there is no per se evidence that a juror must
view as having definitive mitigating effect). Point of error twenty-five is overruled.

 In point of error twenty-eight, appellant claims that Texas death-penalty law violates various federal
constitutional provisions because it does not permit "meaningful appellate review." We have rejected this
claim. See Sells v. State, 121 S.W.3d 748, 767-68 (Tex.Cr.App.), cert. denied, 124 S.Ct. 511 (2003). 
Point of error twenty-eight is overruled.

 In point of error twenty-nine, appellant claims that the trial court should have quashed his indictment
because of the "enumerated constitutional defects" in Texas death-penalty law. And, in points of error
thirty and thirty-one, appellant claims that the cumulative effect of the "above-enumerated constitutional
violations" violates the state and federal constitutions. These claims are without merit. See Turner, 87
S.W.3d at 118. Points of error twenty-nine through thirty-one are overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: June 30, 2004

Publish
1. 

 We note that Fletcher stated during voir dire that she could be "open to the possibility of a life
sentence even on a dangerous police officer killing." See Green v. State, 934 S.W.2d 92, 105 n.6
(Tex.Cr.App. 1996), cert. denied, 117 S.Ct. 1561 (1997) (constitution does not require that jurors
consider any particular evidence to be mitigating).
2. 

 Article 38.22, sets out the state-law requirements for the admission into evidence of various
statements of an accused as a result of "custodial interrogation."
3. 

 See also Hall v. State, 67 S.W.3d 870, 874-75 (Tex.Cr.App.), cert. granted, judgment vacated,
and case remanded here for further consideration [in light of Atkins v. Virginia, 122 S.Ct. 2242 (2002)],
Hall v. Texas, 123 S.Ct. 70 (2002).
4. 

 In his brief, appellant complains about the admission into evidence of State's Exhibits 132-140. 
It is not clear whether he also complains about the admission into evidence of State's Exhibit 131.
5. 

 See Booth v. Maryland, 107 S.Ct. 2529 (1987).
6. 

 See Payne v. Tennessee, 111 S.Ct. 2597, 2611 (1991) overruling Booth.