Opinion issued February 2, 2006











In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-04-00847-CR
____________

RANDALL GLEN LAWS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 993419




MEMORANDUM OPINION
          This is an appeal from the 2004 conviction of appellant, Randall Glen Laws,
who was arrested in 2002 by the cold-case squad of the Harris County Sheriff’s
Department for the 1987 murder of Lyle Sacry, complainant. Appellant pleaded
not guilty to the offense, but a jury found him guilty and sentenced him to 99 years
in prison. In four points of error, appellant contends that the evidence is legally
and factually insufficient to support his conviction. We hold that the evidence is
legally sufficient to corroborate accomplice testimony, and that the evidence is
legally and factually sufficient to establish appellant’s guilt as the primary actor. 
We therefore overrule appellant’s first and second points of error and need not
address appellant’s third and fourth points of error, which challenge the sufficiency
of the evidence to establish appellant’s guilt as a party to the offense. See Ladd v.
State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999) (holding when different theories
submitted to jury in disjunctive and not possible to tell whether jury found
appellant guilty as primary actor or party, general verdict sufficient if evidence
supports one theory of liability submitted). We affirm.
Factual Background
          Complainant was married to Rita Sacry in 1985, but their relationship was
strained and burdened by Rita’s infidelity. Complainant resided only occasionally
with Rita, who lived in Katy, Texas with her daughter, Kelly, her son, Tim, her 15-year-old daughter, Kathy Seefong, and Kathy’s 18-year-old husband, James Peetz.
          According to Peetz, complainant was a religious man and a good provider
who loved his family, but Rita and Kathy only wanted complainant’s money. Also
according to Peetz, in the two years that Peetz was married to Kathy before their
divorce in 1987, Kathy and Rita asked Peetz 60 to 70 times to kill complainant. 
Rita offered Peetz $10,000 and later doubled the amount. Rita wanted complainant
killed so that she could collect on insurance policies valued at over $200,000. 
Although Peetz generally refused these requests, he eventually agreed to kill
complainant. Peetz backed out of the agreement, however, because he felt that he
could not follow through with his attempts to kill complainant. In 1987, before
their divorce, Kathy told Peetz that complainant had molested her and Kelly, her
sister, but Peetz did not believe her because she had never mentioned it before and
believed Kathy was using the information as a tactic to convince Peetz to kill
complainant. Peetz was aware that Rita and Kathy had also asked other men to kill
complainant for them. 
          Robert Hales was Peetz’s friend during Peetz’s marriage to Kathy. In 1987,
Kathy asked Hales if he knew where she could get a gun because she wanted to kill
complainant. Kathy told Hales that she would help him get $20,000 to finance a
moving company if he could get her a gun, but Hales did not take Kathy’s
comments seriously.
          Kathy began living with appellant in an apartment in Houston during her
separation from Peetz. When Hales visited them, Kathy asked Hales twice if he
could get a gun for her to kill complainant. Appellant was present both times when
Kathy made the requests.
          Complainant worked from midnight on Wednesday, August 26, 1987, until
about 8:00 a.m. on Thursday, August 27, 1987, which was the last time that he was
seen at work. Andy DeLewis, who managed the trailer park where complainant
lived, testified that on Thursday, August 27, 1987, he saw a gold car about a
quarter mile from complainant’s house. DeLewis noted a school tassel hanging
inside the car and large speakers.
          The next day, Friday August 28, Alfred Patrick, complainant’s friend, left a
note on complainant’s trailer asking complainant to call him. Patrick was looking
for complainant because he had asked Patrick to take care of his dog while Patrick
would be out of town. Complainant had no one else to care for the dog due to his
wife’s recent move to West Virginia. Patrick noticed that all the doors of the
trailer were locked and that the porch light was off. On Sunday, August 30, Patrick
returned to the trailer looking for complainant because he had not called and had
not been at work. The porch light was on this time; complainant’s van was in a
different position; and the sliding glass door was unlocked. Upon entry into the
trailer, Patrick found complainant dead and in a state of decay near the front door. 
A baseball bat was next to his body, but no firearm was found.
          Crime-scene officers who investigated the scene observed blood splatters in
the room, the trailer in disarray, blood on the mop and near the sink, as if someone
had tried to clean up, and pry marks on the sliding glass door. While officers were
at the trailer, appellant, Kathy, Tim, and Glen Shaw arrived and were questioned
by police officers, both at the scene and the next day at the police station where
they appeared voluntarily for statements. Appellant told one of the officers that
Kathy was his live-in girlfriend. The medical examiner who performed the
autopsy on complainant observed two gunshot wounds, one to the head and one to
the back, as well as numerous laceration-type injuries.
          At 7:30 a.m. on the morning of August 30, the day that complainant’s body
was discovered, Rita called Carolyn Abshere asking if she had seen complainant. 
Carolyn found the telephone call strange because she knew that Rita hated
complainant and never said anything nice about him. Carolyn simply disregarded
the phone call. 
          The next day, August 31, DeLewis stated that the gold car returned and that
the two people in the car, a young man


 and young woman, requested access to
complainant’s trailer. The gold car had a U-Haul trailer attached to it. DeLewis
said that it was the same car that he had seen earlier in the week and identified a
photo of the car.
          The Harris County Sheriff’s Department attempted to file charges against
appellant in 1987, but charges were not accepted by the Harris County District
Attorney’s Office. Fourteen years later, in 2001, the cold-case squad retrieved the
unsolved case. Investigation by Detective Harry Fikaris into payments made
pursuant to insurance policies held by complainant revealed that Rita collected
$50,728 on one policy and that complainant’s father collected $200,000 on another
policy. The cold-case squad again interviewed witnesses and presented the case to
the Harris County District Attorney’s Office. Appellant, Rita and Kathy were
charged with murder and arrested at their places of residence—the women in
Clarksberg, West Virginia and appellant in Florida. Appellant waived extradition
to Texas, but the women fought it.
          In September 2002, appellant was in custody at the Harris County jail
awaiting trial for the murder of complainant. He was in the same jail cell for about
eight weeks with Coy Reeves. Reeves was incarcerated for felony-degree
unauthorized use of a motor vehicle and had an extensive criminal history. 
Appellant spoke endlessly to Reeves, telling “the same story over and over and
over again three or four times” over the course of several days. Appellant told
Reeves that he killed complainant in 1987 at the request of Kathy Seefong, his then
girlfriend, and her mother, Rita Sacry, in exchange for a promise from Kathy and
Rita that they would give him a percentage of the money that they received from
complainant’s insurance policies valued at over $250,000. Appellant also said that
Kathy told him that complainant had molested her and her sister, but stated that he
did not believe that and thought it was Kathy’s way of getting him to kill
complainant. 
          Appellant told Reeves that he drove to complainant’s trailer in his gold
Chevrolet Citation and had a couple of beers with complainant. Appellant then
asked complainant whether he had molested Kathy’s younger sister, which angered
complainant and resulted in his telling appellant to leave the trailer. Appellant left
the trailer, went to his car, got an aluminum bat, put on gloves, and reentered the
trailer with the bat, with which he beat complainant. Complainant struggled and
wrestled with appellant and ultimately took the bat from him. Appellant then shot
complainant twice, in the head and in the back, with a nine millimeter gun that
appellant had gotten several days before from Kathy’s brother. Appellant left
complainant dead near the front door, left the bat in the trailer, and went home. 
Kathy appeared later at appellant’s house, accompanied by her brother Tim and a
man named Glen. Kathy, Tim, and Glen told appellant that they knew that
complainant was dead because they had already been to complainant’s trailer. 
          Appellant told Reeves that he moved to Florida after he gave his statement
to the police, where Kathy later joined him. Kathy’s mother refused to pay him
any money for killing complainant, claiming that she had received only $50,000
from the insurance policies because complainant had switched the beneficiaries to
his parents on the larger policy. Kathy, whom appellant believed would marry him,
later left appellant and never returned to Florida. Appellant also indicated to
Reeves that he had previously owned a U-Haul trailer. 
          At trial, the State presented testimony from ex-convicts who were receiving
dismissals of their pending charges in exchange for their testimony. Peetz
acknowledged that he had been convicted of felony offenses and that the State
agreed to dismiss a pending misdemeanor theft charge in exchange for his
testimony. Reeves likewise acknowledged his extensive criminal history and that
his testimony would result in dismissal of outstanding arrest warrants in Missouri
for auto theft and revocation of parole.
          The State also presented testimony from Glen Shaw, who was around 18
years old at the time of the offense. Shaw’s trial testimony established the
following events that occurred in August 1987. Shaw lived in Clarksberg, West
Virginia, where Kathy and her mother lived. Shaw knew the Seefong family
because he attended the same middle school with Tim, but he did not know
complainant or appellant before August 1987. According to Shaw, in August
1987, he decided to accompany Kathy, whom he was dating, and her brother Tim,
to Houston to retrieve some furniture for Kathy’s mother. The trip lasted about 24
hours, with stops only to eat and get gasoline. They arrived in Katy at around 3:00
a.m. and went directly to complainant’s trailer, where they had planned to sleep. 
Tim stayed in the car, but Shaw and Kathy knocked on the door. When no one
answered, Shaw found an unlocked door, entered the house with Kathy, and
discovered complainant lying on the living room floor near the front door. 
Complainant appeared to have been beaten. Kathy screamed hysterically, and they
quickly left the house and ran to the car, where Tim was waiting. They spent the
night in a motel room together. While there, Shaw heard Tim call his mother, Rita,
in Clarksberg, but he could not hear what was said.
          The next morning, Kathy, Tim and Shaw went to appellant’s house. Shaw
saw photos of appellant with Kathy on the walls of the house, which led Shaw to
believe that appellant and Kathy were living together, not merely dating, as Kathy
had told him just before they got to the house. The group decided to go to
complainant’s trailer and call the police from there, but when they arrived, police
officers were already investigating the scene. Police officers interviewed Shaw,
appellant, Kathy and Tim, both at the scene and at the police station. Shaw was not
interviewed extensively, however, after police officers learned that he was from
out-of-town and had never met complainant. 
          Appellant, Tim, Kathy, and Shaw left the police station and returned to
appellant’s house. As they were “partying” there, appellant admitted that he killed
complainant. Appellant said that he and complainant were friends and that when
complainant fell asleep watching television, appellant started beating complainant
with a bat. Appellant stated that when complainant woke up, a fight ensued. 
Because complainant would not give up the fight despite being beaten with a bat,
appellant shot him with a small gun that he later threw into a pond or lake. 
Appellant also showed Shaw a black eye, which Shaw said was not apparent when
appellant’s eye was open. Either appellant or Kathy told Shaw that appellant killed
complainant because complainant had molested one of Kathy’s sisters. Shaw and
Tim left appellant’s house to stay at a motel room that night, but Kathy remained at
the house.
          The next day, Shaw and Tim returned to the trailer and loaded furniture into
a U-Haul that they drove to West Virginia. Kathy and appellant drove separately
back to West Virginia. Shaw did not see any of them after that trip to Houston in
1987 until the trial in 2004. Shaw testified that he did not receive anything from
the State for his testimony and that he was unaware of animosity or bad feelings
between any of the Seefongs and the deceased. 
          Appellant presented no evidence at trial. The jury charge instructed the jury
that it could find appellant guilty as a party to the offense or as a primary actor. 
The charge also included an accomplice-as-a-matter-of-fact jury instruction
concerning the testimony of Glen Shaw. The jury verdict was a general verdict of
guilty. Sufficiency of Evidence Corroborating Accomplice-Witness Testimony
          Within his first point of error, appellant contends that the evidence
supporting his conviction is legally insufficient because Shaw is an accomplice,
whose testimony must be corroborated, and that the evidence fails to establish the
requisite corroboration. The jury charge instructed the jury to determine whether
Shaw was an accomplice under the facts shown.


 We cannot determine from the
record whether the jury determined that Shaw was an accomplice under the facts
shown, but will assume without deciding that he was an accomplice for purposes of
our analysis of the sufficiency of the evidence.
          Article 38.14 of the Code of Criminal Procedure provides that “[a]
conviction cannot be had upon the testimony of an accomplice unless corroborated
by other evidence tending to connect the defendant with the offense committed;
and the corroboration is not sufficient if it merely shows the commission of the
offense.” Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005); Blake v. State,
971 S.W.2d 451, 454 (Tex. Crim. App. 1998). The accomplice-witness rule is a
statutorily imposed sufficiency standard that requires nonaccomplice evidence
tending to connect the defendant with the offense; the rule is not derived from the
state or federal constitutional principles that otherwise govern legal and factual
sufficiency review. Cathey v. State, 992 S.W.2d 460, 462–63 (Tex. Crim. App.
1999).
          To analyze the sufficiency of corroborative evidence, we eliminate the
testimony of the accomplice witnesses from consideration and then examine the
testimony of other witnesses to ascertain whether the nonaccomplice evidence
tends to connect the accused with the commission of the offense. Hernandez v.
State, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); Reed v. State, 744 S.W.2d
112, 125 (Tex. Crim. App. 1988); St. Julian v. State, 132 S.W.3d 512, 516 (Tex.
App.—Houston [1st Dist.] 2004, pet. ref’d). The nonaccomplice evidence need not
be sufficient by itself to establish the accused’s guilt beyond a reasonable doubt
and need not directly link the defendant to the commission of the crime. 
Hernandez, 939 S.W.2d at 176; St. Julian, 132 S.W.3d at 516; Reynolds v. State,
489 S.W.2d 866, 872 (Tex. Crim. App. 1972). The law requires only that some
nonaccomplice evidence tend to connect the accused to the commission of the
offense. Hernandez, 939 S.W.2d at 176 (emphasis in original); St. Julian, 132
S.W.3d at 516. Thus, seemingly insignificant incriminating circumstances may be
sufficient, corroborative evidence to satisfy the accomplice-witness rule. Dowthitt
v. State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); Munoz v. State, 853 S.W.2d
558, 559 (Tex. Crim. App. 1993). 
          In evaluating the sufficiency of the corroboration, we consider each case on
its own facts and circumstances and look to all facts that furnish the corroboration. 
See Munoz, 853 S.W.2d at 559. While these circumstances might not be sufficient
individually to corroborate the accomplice’s testimony, taken together, rational
jurors could conclude that the circumstances sufficiently tended to connect the
defendant to the offense. Hernandez, 939 S.W.2d at 178–79; see also Cox v. State,
830 S.W.2d 609, 612 (Tex. Crim. App. 1992) (holding that evidence of other
suspicious circumstances filled sufficiency gap arising from evidence of
appellant’s mere presence at scene of offense). Evidence that the defendant was in
the company of the accomplice at or near the time or place of a crime is proper
corroborating evidence to support a conviction. Hernandez, 939 S.W.2d at 178;
see Jackson v. State, 745 S.W.2d 4, 13 (Tex. Crim. App. 1988) (holding that
presence in company of accomplice near time of offense not alone conclusive, but
important factor for corroboration).
          Reeves’s testimony here is nonaccomplice evidence that tends to connect
appellant with the murder of complainant. Reeves testified that appellant described
how he beat and shot complainant and that appellant admitted killing complainant
at Kathy’s and Rita’s request, in exchange for a promise that they would give him a
percentage of the proceeds from complainant’s insurance policies valued at over
$250,000.
          Appellant contends that the testimony of Reeves is not credible and therefore
does not tend to connect appellant to the murder because Reeves testified in
exchange for a dismissal of his pending charges. Although Reeves’s motives for
his testimony are relevant considerations for the jury’s assessment of his
credibility, we nonetheless defer to the jury in deciding the weight to give his
testimony because they were present in the courtroom and in the best position to
make that determination. See Johnson v. State, 23 S.W.3d 1, 8 (Tex. Crim. App.
2000); see also Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). 
          We conclude that the nonaccomplice testimony of Reeves sufficiently tends
to connect appellant to the offense. See Cathey, 992 S.W.2d at 462.Legal and Factual Sufficiency of the Evidence
          In his first and second points of error, appellant contends that the evidence is
legally and factually insufficient to establish that he, as the primary actor,
intentionally or knowingly caused the death of complainant because (1) Shaw’s
and Reeves’s testimony lacked credibility, (2) there were no eyewitnesses to the
offense, (3) no physical evidence connects appellant to the offense, such as
fingerprints, DNA, or firearms, and (4) appellant did not fight extradition to Texas,
as compared to the two women codefendants who fought extradition.
          In a legal sufficiency review, we view all of the evidence in the light most
favorable to the verdict and then determine whether a rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. King v.
State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jurors are the exclusive
judges of the facts, the credibility of the witnesses, and the weight to give their
testimony. Penagraph, 623 S.W.2d at 343. A jury is entitled to accept one version
of the facts and reject another, or reject any part of a witness’s testimony. Id.
          In a factual sufficiency review, we view all of the evidence in a neutral light,
and we will set aside the verdict only if the evidence is so weak that the verdict is
clearly wrong and manifestly unjust, or the contrary evidence is so strong that the
standard of proof beyond a reasonable doubt could not have been met. Escamilla
v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004), cert. denied, 125 S. Ct.
1697 (2005). In a factual sufficiency review, we may not substitute our own
judgment for that of the fact finder. Jones v. State, 944 S.W.2d 642, 648 (Tex.
Crim. App. 1996). In conducting a factual sufficiency review, we must consider
the evidence that the appellant contends most undermines the jury’s verdict. Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Unless the available record
clearly reveals that a different result is appropriate, we defer to the jury’s
determination concerning the weight to place upon conflicting testimony, because
resolution of facts often turns on evaluation of credibility and demeanor. Johnson,
23 S.W.3d at 8.
          The State’s case did not rest exclusively on the testimony of Shaw and
Reeves. The circumstances surrounding appellant were incriminating to appellant. 
For example, DeLewis saw a gold car, identified in a photograph as appellant’s car,
near complainant’s trailer on August 27, the day that complainant was last seen at
work and two days before his body was discovered inside the trailer. Also, on
August 31, after complainant’s death, a young man and woman, driving the same
gold car, returned with a U-Haul trailer and requested access to complainant’s
trailer. Appellant acknowledged that he owned a U-Haul trailer.
          The jury knew that Reeves was an ex-convict with a long criminal history
and that he was receiving a bargain from the State by having his pending charges
dismissed for his testimony. The record also shows that Reeves had not met
appellant before they were incarcerated together, that appellant and Reeves were
friendly with each other and shared the same bunk in the same jail cell, and that
appellant volunteered the information to Reeves, who was acting independently,
without police participation. The jury listening to this evidence was in the best
position to determine what weight to give his testimony. See Johnson, 23 S.W.3d
at 8; see also Penagraph, 623 S.W.2d at 343.
          The jury also knew that Shaw was inside complainant’s trailer after
complainant was killed, did not call the police, returned to the house to take
complainant’s possessions in a U-Haul trailer to another State, knew that appellant
had admitted to killing complainant, but never reported it, and lied to police about
the events. The record also shows, however, that Shaw did not know appellant
before the events that transpired during the week in August 1987 when
complainant was killed and that Shaw had no contact with appellant until the trial
in 2004. We must defer to the jury therefore to determine what weight, if any, to
give the testimony from Shaw. See id.
          Viewing the evidence in the light most favorable to the verdict, we conclude
that a rational trier of fact could have found that appellant intentionally or
knowingly caused the death of complainant and therefore hold that the evidence is
legally sufficient to sustain appellant’s conviction. See King, 29 S.W.3d at 562. 
Additionally, upon viewing all of the evidence in a neutral light, we conclude that
the evidence is neither so weak that the verdict is clearly wrong and manifestly
unjust, nor is the contrary evidence so strong that the standard of proof beyond a
reasonable doubt could not have been met. See Escamilla, 143 S.W.3d at 817. We
conclude, therefore, that the evidence is legally and factually sufficient to sustain
appellant’s conviction for intentionally or knowingly causing the death of
complainant.
          We overrule points of error one and two.
Conclusion
          We affirm the judgment of the trial court.
 
     Elsa Alcala
                                                                        Justice
 
Panel consists of Chief Justice Radack and Justices Jennings and Alcala.
 
Do not publish. Tex. R. App. P. 47.2(b).