**Ex parte Dana Andrew STANSBERY.**

No. 69274.

Court of Criminal Appeals of Texas, En Banc.

Jan. 8, 1986.

Laurel D. Owens, Huntsville, for appellant.

Robert Huttash, State's Atty. and Alfred Walker, First Asst., Austin, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING

PER CURIAM.

This is a post-conviction application for writ of habeas corpus filed pursuant to Art. 11.07, V.A.C.C.P.

Applicant was indicted for two offenses of murder. Applicant moved to suppress his oral and written statements. The trial court held a hearing on the issue and overruled the motion. On May 14, 1979, applicant pled guilty before the court and judicially confessed to the two murders. Pursuant to a plea bargain, the court assessed 25 years in each cause, the terms to run concurrently. On July 2, 1980, this Court affirmed both convictions in an unreported per curiam opinion. We held that "the judicial confessions are sufficient to support the pleas of guilty independent of the contested confession appellant gave to law enforcement officers." Accordingly, we did not address the issue of the trial court's denial of the motion to suppress.

In the instant habeas action, applicant alleges that his plea was involuntary. Applicant claims that he relied on his trial counsel's advice that applicant would be able to appeal the denial of the motion to suppress despite his judicial confession. On original submission, we granted relief and remanded applicant to answer the indictments.

The State filed a motion for rehearing. The State pointed out that we had granted petitions for discretionary review in several cases to reexamine the rule of *Mooney v. State*, 615 S.W.2d 776 (Tex.Cr.App.1981) and *Wooten v. State*, 612 S.W.2d 561 (Tex. Cr.App.1981). The State asked that we take account of our decision on this issue in disposing of the instant claim.

Since the State filed its motion for re-hearing, we have decided *Morgan v. State,* 688 S.W.2d 504 (Tex.Cr.App.1985). In *Morgan* we held that, "Just as the plea itself no longer waives the right to complain of pre-trial rulings on appeal, so the [judicial] confession or admission will not bar an appellate court from reaching the merits of [those matters which have been raised by written motion filed prior to trial]." The holding in *Morgan* applies only to convictions by plea of guilty or nolo contendere before the court, where the court, upon the election of the defendant, assesses punishment and the punishment does not exceed the punishment recommended by the prosecutor and agreed to by the defendant and his attorney. See Art. 44.02, V.A.C.C.P. In all other cases, the *Helms* rule applies:

"Where a plea of guilty is voluntarily and understandingly made, all nonjurisdictional defects including claimed deprivation of federal due process are waived."

*Helms v. State,* 484 S.W.2d 925 (Tex.Cr. App.1972); see also *Broddus v. State,* 693 S.W.2d 459 (1985).

Accordingly, we deny applicant's request to withdraw his plea. We grant review of the trial court's denial of the motion to suppress. See *Ex parte Hilliard,* 687 S.W.2d 316 (Tex.Cr.App.1985). We will treat the merits of applicant's suppression claim on the basis of the record in his original appeal, our Cause Nos. 64,103 and 64,104.

Neither party has summarized the facts. Nor were applicant's written statements included in the record on appeal. We draw on the testimony at the pre-trial hearing to reconstruct the sequence of events.

On September 4, 1978, applicant was involved in a drug deal in El Paso. According to the first version applicant gave police, an argument broke out among the parties, with the result that applicant and Paul Head stabbed and shot two men, killing both. The killing took place at Head's residence. One of the weapons used was applicant's .22 rifle that he carried in his El Camino truck. Applicant and Head loaded the bodies into a van belonging to one of the victims. Applicant drove the van into the desert and abandoned it. Head followed in his car and drove applicant back to El Paso.

Applicant then fled to California in his El Camino. Head remained in El Paso. The two bodies were found on September 9. The subsequent investigation led El Paso Sheriff's officers to conduct a search of Head's residence on September 16. The results of the search gave rise to arrest warrants for applicant (issued on the 16th) and information connecting him with Susan Kingsberry of Albuquerque, New Mexico.

On September 17, Albuquerque police officers questioned Kingsberry, informing her that applicant was wanted for two murders and inquiring of his whereabouts. On September 21, a Thursday, applicant telephoned Kingsberry from Fresno, California, saying that he wanted to surrender himself in El Paso. Kingsberry persuaded applicant to surrender himself in Albuquerque so that they could see each other. Kingsberry alerted the police, and she and an Officer Jenkins met applicant when he arrived at the Albuquerque airport around midnight Thursday, September 21.

Officer Jenkins testified that he took applicant into custody and read him the Miranda warnings at that time. After taking applicant to the police station, Jenkins gave him the Miranda warnings again, obtained a written waiver, and began to question him.

Applicant contends that his oral statement to Jenkins is inadmissable "as he was not warned properly of his rights under the U.S. Constitution." Applicant admitted on the stand that Jenkins warned him at the police station before questioning him, and applicant acknowledged his signature on the written waiver form. The waiver form was offered into evidence at the hearing. The record supports the trial court's ruling.

Jenkins testified about the content of the oral statement as follows:

"A. He told me about a drug deal that was made in El Paso over that La-

bor Day weekend. I believe it was the fourth. He relayed that there was some argument between the parties involved in the drug deal, and that a fight had erupted.

"...

"A. He told me that, in order to stop the fight, he had shot the two individuals that were found.

"...

"Q. What did he relate to you about the weapons used and so on?

"A. There was a twenty-two caliber rifle that he had purchased, and that he had the gun in his truck.

"...

"A. I more or less changed the subject towards the end of the interview. He was under, you know, he was very emotional about the whole thing. After he had talked to me about the homicide, I wanted to kind of get him off of that particular subject, and so I asked him, you know, something to the effect that, 'Well, Dana, you know, we're going to need to have that rifle, so where is your car?' And then, he told me that the car was in California, and told me where it was at, and he told me at that time that the gun was not in the car, but rather, it was in the [Doc Holiday's] pawn shop [in Albuquerque].

"...

"A. He directed me to a specific pawn shop. There were three different Doc Holiday Pawn Shops. I asked him which one of the three it was at, and he indicated it was the one on Juan Topo. There is only one on Juan Topo and it's the Juan Topo mall.

"...

"A. He gave me the model number, and with that information, I was able to look up the information the following morning that had the name, transaction number and everything."

From the information applicant provided Officer Jenkins in this oral statement, Jenkins was able to retrieve the murder weapon from the pawn shop in Albuquerque, and police in California were able to locate the El Camino in Fresno.

Applicant further contends that the oral statement was inadmissible because: 1) applicant did not make the statement voluntarily; 2) the police failed to take applicant before a magistrate without unnecessary delay in violation of Article 15.17, V.A.C. C.P.; 3) the warning does not comply with Article 38.22, V.A.C.C.P., in that "the warning does not state that counsel will be appointed him before the questioning, nor does the warning state that the statement will be used against him 'as evidence at his trial.'"

Article 38.21, supra, provides as follows: "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."

■ The trial court found that applicant made his oral statement to Officer Jenkins voluntarily, and that no coercion, threat, or promise was used against applicant to obtain his oral statement. Applicant argues that Susan Kingsberry persuaded him to turn himself in at Albuquerque. Applicant testified at the pre-trial hearing that when he called Kingsberry on September 21, he had already decided to turn himself in at El Paso. Concerning Kingsberry's suggestion that he turn himself in at Albuquerque instead, applicant testified as follows:

"Q. All right. Did she indicate to you what was going to occur if you did turn yourself in in Albuquerque?

"A. Well, all she said was, I would never make it to El Paso. I would be picked up first, and it would be better for me if I would turn myself in. So, she told me to fly in and they would meet me at the airport.

"Q. Did she, at that time or anytime, make any promises or threats to

you about what would occur, in the event you would turn yourself in?

"A. No, sir. The only thing she said was we would have a chance to see each other for awhile before I was booked into jail.

" . . .

"Q. Okay. So, your decision to turn yourself in at the Albuquerque airport was made from the fact of your close friendship with her?

"A. Well, yeah. She talked me into it, definitely. That's why I did it.

"Q. All right, sir. Now let me see if I can understand that correctly. She talked you into it or you had already made that determination prior to speaking to her, I believe?

"A. No. I was going to go to El Paso, and she said, 'No, don't do it. Leave the car because it's hot. Take a plane and fly into Albuquerque. There is a detective here that's been talking to me and he's already set it up. If you turn yourself in, you can just turn yourself in to us, and we can have a chance to be with each other.' "

That his telephone conversation with Kingsberry may have affected applicant's choice of where to give himself up does not lead to the conclusion that he did not make his subsequent oral statement voluntarily. Nothing in the record reflects that applicant's oral statement was involuntary.

■■■ The record reflects that Officer Jenkins did not take applicant before a magistrate. The record does not reflect any causal connection between that fact and applicant's oral statement. In *Hester v. State*, 544 S.W.2d 129 (Tex.Cr.App.1976) we wrote:

"Unless there is a showing that there is a causal connection between the failure

to take the defendant before a magistrate and the giving of the confession, the validity of the confession is not affected by such failure."

Applicant argues in the alternative that the rule of *Hester* be overturned. We decline the invitation.

Article 38.22, Sec. 3.(a), supra, provides in pertinent part:

"No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

" . . .

"(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;"

■■■ Applicant contends that the warning did not comply with the requirements of Art. 38.22, Sec. 2(a), supra. Yet Sec. 3(c) of the same article provides:

"(c) Subsection (a) of this section shall not apply to any statement which contains assertions of fact or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed."

Officer Jenkins testified that he did not know the whereabouts of the .22 caliber rifle used to murder the victims until applicant told him that it was at the Doc Holiday's pawn shop in the Juan Topo mall. Jenkins retrieved it there the following day. In these circumstances, Section 3(c) exempts applicant's oral statement from the warning requirements of Article 38.22, Sec. 2(a). Therefore, that the warning did not track the language of the statute does not affect the statement's admissibility under Article 38.22.

Applicant's contention that his oral statement was inadmissible is overruled.

Applicant also contends that his two written statements were inadmissible.

El Paso police were notified of applicant's arrest. El Paso Officers Cross and Omohundro arrived in Albuquerque on Friday, September 22. Cross testified that he asked the Albuquerque officer in charge whether applicant had been taken before a New Mexico magistrate. The officer replied that he had not, because it was a holiday in New Mexico (called Fair Day in Albuquerque) and no magistrates were available, although several attempts had been made to locate one. Cross asked that another attempt be made to locate one. Cross testified that another attempt was then made by telephone in his presence, without success.

Cross and Omohundro met with applicant shortly after 3:00 p.m. that same afternoon. Cross testified that Omonundro read applicant the Miranda warnings from a plastic card. Cross testified that "Subsequently, prior to the taking of any statements, I again read the warnings to Mr. Stansberry, from the statement forms themselves." Cross testified that the warning on the statement form was "The exact same warning that I read from the second statement form." Cross read into the record at the pre-trial hearing the warning appearing on the face of applicant's second statement, that is, from the second statement form.

Applicant contends of the warning on the statement forms that "The warning does not state that counsel will be appointed him before the questioning, nor does the warning state that the statement will be used against him 'as evidence at his trial.'"

The warning on the statement forms used by Officer Cross is in the first person. The warning states, "I, Dana Andrew Stansbery, having been duly warned by R.P. Cross ... that I have the right ..." The warning contains the following: "I have the right to have a lawyer appointed to counsel with me prior to or during any questioning." The warning also contains the following: "I have the right to remain silent and not to make any statement and that any statement or statements made may be used in evidence against me at my trial or trials."

Applicant's contention that certain language is absent from the warnings is overruled.

The record reflects no causal connection between the failure of the officers to take applicant before a magistrate without unnecessary delay, as required by Art. 15.17, supra, and applicant's making the first written statement. Absent the showing of a causal connection, the failure does not render the statement inadmissible. *Hester v. State,* supra.

Finally, nothing in the record reflects that the statement was obtained by promises, threats, or coercion of any kind. Applicant's contention that the statement was involuntary is overruled.

Cross and Omohundro finished taking applicant's first statement about 8:15 p.m. on September 22. At some point that evening, applicant expressed to Cross and Omohundro his desire to visit with Susan Kingsberry before returning to El Paso. Because there were no magistrates available to preside over the extradition procedures, Cross and Omohundro were waiting out the weekend at Officer Jenkins' home in Albuquerque. On the evening of Saturday, the 23rd, Kingsberry called the officers at Jenkins' home and asked permission to see applicant before he was extradited to El Paso. The officers assented and a visit was arranged for the next morning.

Around 9:30 a.m. on Sunday, the 24th, Kingsberry and applicant were allowed to visit privately in an interview room. Kingsberry testified at the pre-trial hearing about her conversation with applicant as follows:

"Q. What did you talk to him about?

"A. Mainly about Christianity, the Bible, the fact that I would be his friend, no matter what, mainly about—he seemed like he was in so much despair over the whole situa-

tion, and I was just trying to find ways to help him make it through the whole ordeal, and it was mainly based on Christian backing or whatever.

"Q. Did you in any way attempt to coerce or persuade or trick Mr. Stansbery into talking with the officers that were there?

"A. No, sir.

" . . .

"Q. Okay. Did he indicate any desire or wish after you had talked with him?

"A. Yes. We had prayed together and we were both crying, and we had been reading some of the Bible, and Dana looked up at me and said, 'Please tell the detectives that he wanted to change his statement.'"

Kingsberry told the officers of applicant's wish to change his statement. Officer Cross warned applicant again and took applicant's second written statement. In this version, applicant stated that the killings did not result from an argument and fight, but that he and Head had planned the killings.

■ Applicant argues that Kingsberry's talk with him coerced him into giving the second written statement. The record contains no support for this contention.

Applicant argues that the conditions in the Albuquerque jail coerced his second written statement. He testified on this point as follows:

"Q. All right. And were you, at any time, denied food, or water, or anything else that you may have needed during the time that you were in custody?

"A. Not maybe intentionally, by the officers, but it would—when I would come back from questioning, the mealtimes were always over at the jail.

"Q. All right. And then, what would occur? You wouldn't get anything to eat or what?

"A. No, sir. And when the meals did come, the tank had several tank bosses in it, and there was just three of us that were Anglo in there, and I watched the other two get beat up because they wanted their tray, and so, I wasn't going to push it. So, in essence, until I got—was fed over there when [Cross and Omohundro] bought those hamburgers. I couldn't eat in that jail. That's one of the reasons I waived extradition."

On the other hand, applicant also testified as follows:

"Q. At any rate, again, is it your statement that you would not have changed your original statement had it not been for Susan Kingsberry?

"A. I would never have changed it."

The record supports the trial court's finding that the second written statement was made voluntarily.

Finally, the record reflects no causal connection between the failure of the officers to take applicant before a magistrate without unnecessary delay, as required by Art. 15.17, supra, and applicant's making the second written statement. Absent the showing of a causal connection, the failure does not render the statement inadmissible. *Hester v. State,* supra.

The State's motion for rehearing is granted. Applicant's contentions that the trial court erred in denying his motion to suppress are overruled. The relief prayed for is denied.

ONION, P.J., dissents.

CLINTON, Judge, dissenting.

Although on original submission a practically unanimous Court found that applicant's pleas of guilty were involuntary, now without explication a majority would have the Court deny his "request to withdraw his plea" and, contrary to first principles and *sua sponte,* utilize a postconviction habeas corpus proceeding to serve the office of an appeal, *viz:*

"Accordingly, we deny applicant's request to withdraw his plea. We grant review of the trial court's denial of the motion to suppress. See *Ex parte Hilliard,* 687 S.W.2d 316 (Tex.Cr.App.1985). We will treat the merits of applicant's suppression claim on the basis of the record in his original appeal, our Cause Nos. 64,103 and 64,104."

For several reasons I dissent.

First, assuming the opinion on original submission was correct in finding applicant's pleas were involuntary when made, *Morgan v. State,* 688 S.W.2d 504 (Tex.Cr. App.1985), does not serve to change the nature and character of his pleas. If involuntary they still remain involuntary.

Second, the historical facts of the matter are that on direct appeal the Court affirmed the judgment since the incourt judicial confession was sufficient to support the pleas independently from the statements made to officers, and that on original submission in this proceeding it was judicially determined that the pleas were involuntary and, accordingly, applicant was remanded to answer the indictment. Are we now saying that the plea was voluntary and, therefore, may not be withdrawn?

Finally, on what basis are we reviewing the merits of his suppression claim? I have seen *Hilliard.* He made a "conditional plea." The issue there was whether the State had complied with the Texas Speedy Trial Act, an issue more jurisdictional in nature. The Court found it had not and, accordingly, vacated the judgment of conviction and ordered the prosecution dismissed. Here, however, the judgments are not void, only voidable—should it be found that the trial court erred in admitting the statements, for such "trial error" the remedy would be simply to remand applicant to local custody to answer the same indictment.

Again, I must protest misuse of The Great Writ. See *Ex parte Aaron,* 691 S.W.2d 680, 684 (Tex.Cr.App.1985), and *Ex parte Collier,* 614 S.W.2d 429, 436 (Tex.Cr. App.1981) (Clinton, J., concurring).