Opinion issued October 28, 2004






            











In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-03-00835-CR
__________

RODERICK KEITH COOPER, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 184th District Court
Harris County, Texas
Trial Court Cause No. 887,345
 

 
 
MEMORANDUM OPINION
          A jury found appellant, Roderick Keith Cooper, guilty of capital murder.


 
Based on the jury’s affirmative answers to the three special issues, the trial court
sentenced appellant to confinement for life.
          In six points of error, appellant contends that the trial court erred in denying
appellant’s motion to suppress statements that he made to police officers while he was
in custody; the trial court erred in sustaining the State’s objection to testimony from
appellant’s brother that appellant’s accomplice had admitted to having shot the
victims; and the evidence was legally and factually insufficient to support the jury’s
verdict.
          We affirm.
Factual and Procedural Background
          Houston Police Officer M. Batiste testified that, while he was on patrol
sometime after 10:00 p.m. on September 4, 2001, he parked his patrol car in the
parking lot of a Hollywood Video store on Fondren. As Batiste was completing some
paperwork, a man came up to his patrol car and told him that he thought that
something was wrong inside the video store. Batiste looked inside the store and saw
that the lights were on, but he did not see any employees. He then radioed for
additional Houston Police officers to assist him, and, after two more officers arrived,
Batiste and the other officers entered the store. Once inside the store, the officers did
not see anyone and, when they called out, received no response. The officers
searched the store–with the exception of the manager’s office, which was locked–and
found no one. Through their dispatcher, the officers contacted the store director,
Vonda Morales, who brought an office key to the store. When the officers opened the
office door, they found the bodies of two store employees, Angela Sanchez and Kola
Osemwengie. Batiste then requested medical assistance and subsequently notified
the Houston Police Department’s homicide division. Batiste further testified that he
had known the complainants by name from having seen and spoken to them during
his patrols of the store area, and he identified appellant as someone he had seen
working at the store before September 4, 2001.
          Harris County Assistant Medical Examiner Dr. Paul Shrode testified that, based
on the findings of the autopsies performed by Dr. Delbert Van Dusen, both of the
complainants had died from fatal gunshot wounds to the head. Sanchez had been shot
once in the back of the head. Osemwengie had been shot twice: the first bullet had
traveled through the palm and out the back of his right hand, and then into his
forehead; the second bullet had entered his brain from the right side of his head. Dr.
Shrode noted that the evidence of stippling on the palm of Osemwengie’s right hand
was consistent with a weapon having been fired between six and 18 inches from his
hand. When asked whether he thought it was possible that the person who had shot
the complainants could have done so while standing in the doorway of the store
office, Dr. Shrode testified that he did not think that it was a “reasonable option.”
          Houston Police Department Sergeant W. Wendel testified that he and his
partner, former Houston Police Officer F. Hale, were assigned to investigate the
shootings. In his investigation of the crime scene, Wendel found that a surveillance
tape was missing from the VCR located in the manager’s office and that the
complainants’ keys were missing. Wendel also noticed that the store cash registers
showed that the last entry had occurred at about 11:00 p.m.
          Houston Police Officer E. Aguilera testified that, as a member of the crime
scene unit, he investigated the scene of the shootings. No shell casings were
recovered from inside the video store office, which Aguilera testified was consistent
with someone having used a revolver to shoot the complainants. Houston Police
Department Firearms Examiner K. Downs testified that she examined the three bullets
and their fragments removed from the complainants, and she determined that the
bullets had all been fired from the same weapon–either a .38 special or a .357
magnum revolver.
          Morales testified that appellant had worked at the store for about 90 days and
had been fired on August 27, 2001, about one week before the shootings. She
explained that the store was equipped with a video surveillance camera that recorded
events inside the store onto a tape in a VCR in the manager’s office. Only a manager
or a shift leader has a key to the manager’s office, and, during the time that appellant
was employed at the store, he did not have such a key. The store office also
contained a safe–used to keep the store’s “house money”–which was found to be
empty at the time that the police officers discovered the complainants’ bodies. 
Morales noted that this safe could have been opened only by Osemwengie. Morales
also testified that, sometime between 7:30 p.m and 8:00 p.m. on the night of the
shootings, she had called the store and had told Osemwengie that she had left
appellant’s final paycheck in the cash drawer at the front of the store. Wendel
testified that, during his inspection of the store, he had not found appellant’s
paycheck.
          Batiste testified that the complainants’ cars were not found in the parking lot
of the video store, but that Osemwengie’s car was recovered the following day in the
parking lot of a grocery store.
          Appellant’s twin brother, Broderick Cooper, testified that, at the time of the
shootings, he and appellant were living in an apartment together, along with their
cousin, Michael Walls. On the morning after the shootings, appellant and Walls came
to the apartment, and Broderick noticed that Walls was carrying a backpack
containing a gun, some money, and a videotape. Appellant and Walls counted the
money and gave $400 to Broderick, who used the money to pay the rent. In
Broderick’s opinion, as between appellant and Walls, Walls was “the leader,” “the
stronger individual,” and “the only one that talked about what [had] happened” at the
video store the night before.
          Lynn Fisher, a former co-worker of appellant’s, testified that she knew
appellant because they had previously worked together. At the time of the shootings,
Fisher worked as a cashier at Wal-Mart, along with appellant’s girlfriend at the time,
Shavonne Pippens, and Fisher had heard about the events at the video store. Two
days after the shootings, Fisher gave Pippens a ride to Pippens’s apartment, where
they picked up appellant, and the three then continued on in Fisher’s car to her
apartment. As they drove to her apartment, Fisher asked appellant what he had done
with the gun and the videotape after the shootings. With respect to both, appellant
had told her that he had “got[ten] rid of it.” After leaving Pippens and appellant at
the apartment, Fisher picked up appellant’s mother and brought her to the apartment
“so she could talk him into turning himself in” to the authorities. When they returned
to Fisher’s apartment, appellant was gone. The following day, Fisher gave a
statement to the police officers investigating the shootings.
          Shavonne Pippens testified that, at the time of the shootings, she had been
appellant’s girlfriend. When the officers investigating the shootings initially
interviewed her, Pippens gave them a statement indicating that she did not know
anything about the events at the store and that appellant had not told her anything
about it. However, Pippens later changed her statement, but could not remember the
substance of her second statement. She explained that she had changed her statement
because she had felt threatened by the investigating officers, because the officers told
her “if I didn’t tell them what they wanted to hear that they was going to take my
daughter away from me and give me 20 years in jail.”
          Three days after the murders, appellant, accompanied by his mother and sister,
went to the Houston Police Department’s homicide division to give a statement
concerning his knowledge of the events. Former Houston Police Officer F. Hale
testified that he met with appellant at about 10:00 a.m. on September 7, 2001 and
discussed appellant’s knowledge of the events at the video store. Appellant gave
Hale a written statement, which was admitted into evidence. In his written statement,
appellant explained that, on the evening of September 4, 2001, he had gone to the
video store, had picked up his last paycheck sometime between 9:00 p.m. and 9:30
p.m., had then left the store, and had spent the night at a girlfriend’s apartment. In his
written statement, appellant denied having “anything to do with this homicide.” At
trial, appellant acknowledged that, before he gave his written statement, Hale had
read several warnings to appellant concerning, among other things, appellant’s legal
rights to remain silent, to have a lawyer present, and to terminate the interview and
that, after he gave Hale the statement, appellant had initialed each of the warnings on
the statement form and signed it.
          Hale testified that he also asked appellant if appellant would provide a set of
fingerprints and submit to a polygraph examination, and appellant consented to do
both. Appellant provided Hale with a set of fingerprints, and, at about noon, Hale
took appellant to a polygraph examiner.
          Based on the evidence obtained in their investigation of the shootings, Hale
and Wendel obtained an arrest warrant for appellant that day and arrested him at
approximately 3:15 p.m. while he was still taking the polygraph examination.


 
Appellant was then taken to an interview room where Sergeant Wendel interviewed
him and informed him that he was a suspect in the murders. Wendel then turned
appellant over to Houston Police Officer J. Swaim for further questioning. Swaim
testified that he interviewed appellant from 3:30 p.m. to approximately 4:15 p.m. and
that, at that time, appellant denied any involvement in the shootings.
          Houston Police Officer T. Miller testified that, a few minutes later, he also
interviewed appellant. During this interview, Miller played, in appellant’s presence,
a portion of a tape-recorded statement given by Pippens, in which Pippens had stated
that appellant had told her that he had been the person who had committed the
murders. Miller also informed appellant that Fischer had given a statement
implicating appellant in the crime. Appellant then told Miller that Pippens and
Fischer were lying. After Miller and appellant discussed the impact of the murders
on the complainants’ families, appellant asked for a cigarette and then admitted to
Miller that he had been involved in the crime and had shot the complainants. 
Appellant then consented to give a recorded statement. Miller again advised
appellant of his legal rights


 and, after appellant agreed to waive his rights, Miller
recorded appellant’s statement.
          In his recorded statement, appellant told Miller that, on the evening of
September 4, 2001, appellant completed the class he was attending at about 8:15 p.m.
and then called the video store to talk to Osemwengie to find out if appellant’s last
paycheck was at the store. When he learned that his check was at the store, appellant
told Osemwengie that he would come pick it up that evening. Appellant stated that
he then went home and got his backpack, which contained a .357 handgun, and he
and his cousin, Michael Walls, discussed robbing the video store. The two men then
walked to the store, arriving “a little bit after [10:00 p.m.].” Appellant stated that,
after he and Walls arrived at the store, he picked up his paycheck from Osemwengie,
pretended to browse the store’s selection of movies, and took the handgun out of the
backpack and put it in his pocket. Appellant waited until all of the store’s customers
were gone and then pulled the gun out of his pocket and told Osemwengie and
Sanchez to “go in the office and . . . give me the money.” Appellant stated that he and
Walls then took the complainants into the store office and told them to sit down. 
Osemwengie opened the store safe and gave the money to appellant, and Walls put
the money in the backpack and left the office. Appellant also instructed Osemwengie
to remove the videotape from the store’s surveillance camera and to give it to him,
and Osemwengie complied.
          With regard to the shootings, appellant stated as follows:
[S]o after he got all the money he had left out the office. And I, and I
told [Osemwengie], and I say ya’ll just turn around and I’m gonna leave. 
And ya’ll, it’ll be like that, and [Osemwengie] was telling me, we was
cool. And I say, it ain’t nothing against you [Osemwengie], I just
needed some money so I’m gonna leave after that. And so, as I was
turning around walking out the door, I was halfway out the door and I
had put the gun back in my pocket. And I heard [Sanchez] telling
[Osemwengie] that she was gonna call the police and tell them
[inaudible] just robbed them and they was leaving. And, and something 
just snapped . . . .

Appellant stated that he then turned around and shot Sanchez once and Osemwengie
twice. Appellant and Walls then took the complainants’ car keys and drove the
complainants’ cars to appellant’s apartment—appellant drove Osemwengie’s car and
Walls drove Sanchez’s car. Appellant and Walls counted the money at appellant’s
apartment and then put the gun, the bullets, some papers from the store, and the store
surveillance tape in a bag to throw away. The two men then drove the complainants’
cars to a grocery store parking lot and left them there. Appellant stated that they also
threw the bag containing the items from the store into a trash can next to a bus stop.
          The following day, when appellant’s twin brother, Broderick Cooper, noticed
that appellant and Walls had some money and asked where they got it, appellant did
not tell his brother where the money had come from. Later that day, appellant went
to see Pippens at her apartment, and she began to cry when she saw that appellant was
interested in watching a news report of the murders at the video store. Appellant
stated that he did not admit to Pippens that he had killed the complainants, but told
her that he “knew who did it.” Appellant also stated that he subsequently admitted
to his ex-girlfriend, Shamona Williams, that he had killed the complainants.
          During his tape-recorded statement, appellant agreed to show Officer Miller
where he and Walls had discarded the bag containing the gun and store surveillance
videotape. Miller testified that, after appellant completed his recorded statement,
Miller got appellant some food and then he and Houston Police Sergeant R. Parish
drove appellant to the bus stop where appellant had indicated that he had discarded
the bag of items. They arrived at the bus stop at about 6:00 p.m., and Miller looked
through the trash can identified by appellant, but found nothing. Metro Transit
Authority employee J. Capetillo testified that, according to his log sheet, as part of
his job duties, he had cleaned the area around and had emptied the trash can at that
bus stop on the day before the officers had searched it.
          Miller also testified that appellant showed the officers where, in a nearby
grocery store parking lot, he and Walls had left the complainant’s cars. Miller
explained that the parking lot, which was across the street from appellant’s apartment
complex, was located approximately 1.5 miles from the video store. Appellant
identified Sanchez’s car, which was still parked in the lot. Appellant then agreed to
show the officers where his ex-girlfriend, Williams, lived because he thought that
Walls might be staying there. The officers then drove appellant to the apartment
complex where Williams lived, but Walls could not be located. At about 7:30 p.m.,
Miller turned appellant over to Sergeant Wendel and Officer Hale. Wendel and Hale
then took appellant before a magistrate, who informed appellant of his legal rights



and set a bond. Appellant was then transported to jail.
          Appellant testified that he and Walls planned for appellant to enter the store
alone on the pretext of picking up his remaining paycheck. Walls would then enter
the store later and force the complainants into the office so that appellant could empty
the cash register drawers unsuspected. Appellant admitted that, on the night of the
shootings, he and Walls had gone to the video store in an attempt to carry out their
plan. Appellant explained, however, that, as he was taking money from the cash
registers, he heard three gunshots in the back of the store where Walls had taken the
complainants. Walls then came running out of the office, carrying Sanchez’s keys,
and appellant asked him, “What happened?” Both men then ran out of the store, took
the complainants’ cars, and drove to appellant’s apartment. That night, appellant and
Walls stayed at the apartment of appellant’s former girlfriend, Shamona Williams,
and then returned to appellant’s apartment the next morning. Appellant denied that
he ever had the backpack in his possession and denied that he ever planned to kill, or
to assist in killing, the complainants.
          Appellant admitted that his written statement, in which he had denied any
involvement in the events at the video store, was false. Appellant also admitted that
Fisher had given him a ride after the shootings, but he denied ever telling her that he
had been involved. Appellant also testified that he had fabricated portions of his
tape-recorded statement; specifically, the portions concerning whether he or Walls
had shot the complainants and whether he and Walls had ever disposed of the gun and
the store surveillance videotape in a trash can at a bus stop. Appellant explained that
he had “made up” the fact that he and Walls had disposed of the videotape in the trash
can he had later pointed out to the investigating officers; however, on cross-examination, appellant conceded that, had the officers located the videotape, it could
have shown that appellant had not shot the complainants.
          Appellant also testified that, before he gave his tape-recorded statement,
Officer Miller grabbed him by the front of his shirt, pushed him against the wall of
the interview room, and told appellant that he was “tired of putting up with me saying
I didn’t have no involvement in it and he knew I did.” When asked why he had
confessed to police officers to two murders that he testified he did not commit,
appellant stated, “I was taught not to snitch on people that wasn’t caught in the
involvement of a case that I got caught up in.”
Voluntariness of Recorded Statement
          In his first point of error, appellant argues that the trial court erred in denying
his motion to suppress the tape-recorded statement that appellant gave to the
investigating police officers because the statement was not given voluntarily.



          We review a trial court’s denial of a motion to suppress evidence for an abuse
of discretion. Oles v. State, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). A trial
court abuses its discretion when it acts without reference to any guiding rules or
principles by acting arbitrarily or unreasonably. Galliford v. State, 101 S.W.3d 600,
604 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d). We will afford almost total
deference to a trial court’s determination of historical facts supported by the record,
especially when the findings are based on an evaluation of the credibility and
demeanor of the witnesses. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App.
1997). In reviewing a ruling on a question of application of law to facts, we review
the evidence in the light most favorable to the trial court’s ruling. Id.
          At the hearing on his motion to suppress evidence, appellant testified that, after
he gave his written statement, the officers told him that he would not be permitted to
leave until he had also provided them with some fingerprints and had taken a
polygraph test. Appellant admitted that, after he was later arrested, he never
requested a lawyer, but he explained that he did not think that he was entitled to have
a lawyer at that time. Appellant explained that, at the time that he gave his recorded
statement, he was scared and felt that the officers questioning him were “trying to
pressure me to say I done it.” Appellant described his questioning by Sergeant
Swaim and by Officer Miller, in part, as follows:
Well, I been there all day, I got tired of being in there, and then as I kept
denying it, they – I could see they was getting mad; but the last two
officers . . . they are the ones that put their hands on me in the thing. 
They didn’t physically, with their fist [balled] up, but they was grabbing
my clothes. . . . They didn’t physically put their hands on me but they
was grabbing the front of my shirt telling me they got people in other
rooms saying I did it, so I might as well tell them I done it.

Appellant testified that, just before he gave his recorded statement, he “broke down
and cried” and that he felt that he had been forced to give the recorded statement so
that the officers would leave him alone.
          Officer Miller testified that he never put his hands on appellant or threatened
him and did not see any other officers threaten appellant. Appellant never asked
Miller for a lawyer, never asked to stop the interview, and never told Miller that any
other officer had threatened him. Sergeant Swaim testified similarly. The State
presented testimony from Hale, Wendel, and Miller that, at the time that appellant (1)
gave his written statement, (2) was arrested, and (3) gave his tape-recorded statement,
he was informed of his legal rights to remain silent, to have an attorney present, and
to terminate any questioning and that appellant had indicated that he understood and
voluntarily agreed to waive those rights. See Tex. Code Crim. Proc. Ann. art. 38.22
(Vernon 1979 & Supp. 2004-2005). Appellant placed his initials next to these
warnings on the form of his written statement, and he subsequently indicated that he
understood these warnings when they were recited to him during his tape-recorded
statement. At trial, when questioned by appellant’s counsel as to why the
investigating officers had continued to question appellant after he had denied any
involvement in the shootings, Swaim responded
My job was to get him to tell the truth. We didn’t feel like he was
telling the truth, that he had no involvement. We believed he was
involved; and it was my job to get him to go and attempt to get him to
tell the truth.

          In determining whether appellant’s recorded statement was given voluntarily,
the trial court was required to evaluate and weigh the credibility of the testimony of
the officers against that of appellant. In announcing its findings at the conclusion of
the hearing on appellant’s motion to suppress evidence, the trial court specifically
noted that it found the testimony of Hale, Wendel, Swaim, and Miller to be credible
and that it found appellant to be not credible. We defer to this finding, as it is based
on an evaluation of the credibility and demeanor of the witnesses who testified in the
trial court. Guzman, 955 S.W.2d at 89. Accordingly, we hold that the trial court did
not abuse its discretion in denying appellant’s motion to suppress his recorded
statement on the grounds that it was given involuntarily.
          We overrule appellant’s first point of error.
Appearance Before Magistrate
          In his second and third points of error, appellant argues that the trial court erred
in denying his motion to suppress his tape-recorded statement and his later, oral
statements made to Miller concerning the location where appellant and Walls had
abandoned the complainants’ cars because “the statements were rendered in violation
of [appellant’s] state statutory right to be promptly taken before a magistrate upon
arrest.”
          With regard to a defendant’s right to be taken before a magistrate following his
arrest, the Code of Criminal Procedure provides, in pertinent part, as follows:
In each case enumerated in this Code, the person making the arrest or
the person having custody of the person arrested shall without
unnecessary delay, but not later than 48 hours after the person is
arrested, take the person arrested or have him taken before some
magistrate of the county where the accused was arrested . . . . The
magistrate shall inform in clear language the person arrested . . . of the
accusation against him and of any affidavit filed therewith, of his right
to retain counsel, of his right to remain silent, of his right to have an
attorney present during any interview with peace officers or attorneys
representing the state, of his right to terminate the interview at any time,
and of his right to have an examining trial. The magistrate shall also
inform the person arrested of the person’s right to request the
appointment of counsel if the person cannot afford counsel.

Tex. Code Crim. Proc. Ann. art. 15.17(a) (Vernon Supp. 2004-2005) (emphasis
added). It is a defendant’s burden to demonstrate (1) that a delay was unnecessary
and (2) the existence of a causal connection between the confession and the failure
to take him before a magistrate without unnecessary delay. Bonner v. State, 804
S.W.2d 580, 582 (Tex. App.—Houston [1st Dist.] 1991, pet. ref’d).
          The record indicates that appellant was arrested on September 7, 2001 at
approximately 3:15 p.m. and was not taken before a magistrate until approximately
7:30 p.m. Hale testified that, at the time that appellant was arrested, appellant could
have been taken before a magistrate immediately. The State argues that the
approximately four and one-half hour delay between the time that appellant was
arrested and he was taken before a magistrate was not unnecessary because, during
that time, appellant confessed to having killed the complainants and then offered to
show the investigating officers the possible location of additional physical evidence
and of his accomplice; thus a portion of this time period was required to transport
appellant to and from these locations.
          However, assuming, without deciding, that the police officers’ delay in taking
appellant before a magistrate in this case was unnecessary, the Court of Criminal
Appeals has held that violations of article 15.17 do not automatically invalidate a
confession. “Absent a showing of a causal connection between an accused’s
confession and the failure to take the accused promptly before a magistrate, the
validity of the confession is not affected.” Williams v. State, 692 S.W.2d 671, 675-76
(Tex. Crim. App. 1984); see Cantu v. State, 842 S.W.2d 667, 680 (Tex. Crim. App.
1992) (holding that defendant failed to show causal connection between State’s
failure to take him before magistrate and statements he gave to police; thus,
statements were properly admitted at trial); Ex parte Stansbery, 702 S.W.2d 643, 647
(Tex. Crim. App. 1986) (concluding that because record did not reflect causal
connection between failure to take defendant before magistrate and confession,
defendant’s contention that his oral statement was inadmissible was without merit).
          Here, appellant has not shown that the approximately four and one-half hour
delay by the officers in taking him before a magistrate caused him to give the tape-recorded statement or to show the officers where appellant and Walls had abandoned
the complainants’ cars. Moreover, as noted above, the trial court heard testimony and
evidence that, at several stages of appellant’s questioning, officers had informed him
orally and in writing of his legal rights, as identified in article 15.17, and appellant
had indicated that he understood and had voluntarily agreed to waive those rights.
          Accordingly, we hold that the trial court did not err in denying appellant’s
motion to suppress his tape-recorded statement and his oral statements concerning the
location where he and Walls had abandoned the complainants’ cars on the grounds
that they were rendered in violation of appellant’s right “to be promptly taken before
a magistrate upon arrest.”
          We overrule appellant’s second and third points of error.
Statement Against Interest
          In his fourth point of error, appellant argues that the trial court erred in
sustaining the State’s objection to and excluding the testimony of appellant’s brother,
Broderick, that Walls admitted to Broderick that Walls had shot and killed the
complainants at the video store. Appellant contends that his brother’s testimony
about Walls’ statement was admissible because the statement was against Walls’
interest. See Tex. R. Evid. 803(24).
          Generally, hearsay statements are inadmissible. Tex. R. Evid. 802. However,
certain types of hearsay are admissible as exceptions to this general rule, including
[a] statement which was at the time of its making so far contrary to the
declarant’s pecuniary or proprietary interest, or so far tended to subject
the declarant to civil or criminal liability, or to render invalid a claim by
the declarant against another, or to make the declarant an object of
hatred, ridicule, or disgrace, that a reasonable person in his position
would not have made the statement unless believing it to be true.

Tex. R. Evid. 803(24). In a criminal case, a statement that tends to expose a
declarant to criminal liability is not admissible “unless corroborating circumstances
clearly indicate the trustworthiness of the statement.” Id.
          The consideration of the admissibility of a statement under rule 803(24)
requires a two-step inquiry. A trial court must determine (1) whether the statement
in question tends to expose the declarant to criminal liability and (2) whether
corroborating circumstances exist that clearly indicate the trustworthiness of the
statement. Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). The
requirements of rule 803(24) are met only if both criteria are satisfied. Id.
          Although there is no definitive test by which to gauge the existence of
corroborating circumstances, the Court of Criminal Appeals has looked to (1) whether
the guilt of the declarant is inconsistent with the guilt of the accused, (2) whether the
declarant was so situated that he might have committed the crime, (3) the time of the
declaration and its spontaneity, (4) the party to whom the declaration was made, and
(5) the existence of independent, corroborating facts. Davis v. State, 872 S.W.2d 743,
749 (Tex. Crim. App. 1994); Holliday v. State, 14 S.W.3d 784, 787 (Tex.
App.—Houston [1st Dist.] 2000, pet. ref’d). The focus of this inquiry is on verifying,
to the greatest extent possible, the trustworthiness of the statement, so as to avoid the
admission of a fabrication. Bingham, 987 S.W.2d at 58. We review a trial court’s
decision to admit or to exclude a hearsay statement offered under rule 803(24) for
abuse of discretion. Id. at 57.
          Here, as noted above, Broderick testified that, the morning after the shootings,
appellant and Walls, who were living with Broderick, came to Broderick’s apartment. 
Broderick noticed that Walls was carrying a backpack containing a gun, some money,
and a videotape. Appellant and Walls counted the money and gave $400 to
Broderick, who used the money to pay the rent. In Broderick’s opinion, as between
appellant and Walls, Walls was “the leader,” “the stronger individual,” and “the only
one that talked about what [had] happened” at the video store.
          Outside the presence of the jury, appellant offered Broderick’s testimony that,
while appellant was taking a shower at the apartment that morning, Walls admitted
to Broderick that Walls had shot and killed the complainants during the video store
robbery “because they can find out who [appellant] was because he used to work
there.” Appellant offered this testimony as a hearsay exception, under rule 803(24).
          There is no dispute that the statement attributed to Walls is a statement against
interest, in that it subjects him to potential criminal liability for the murders of the
complainants. Thus, the first criterion of rule 803(24) is satisfied. See Bingham, 987
S.W.2d at 57. However, at the hearing outside the presence of the jury, the trial court
inquired of appellant’s counsel as follows:
The Court:Section 24 [of rule 803] on statement against interest
clearly says in criminal cases a statement tending to
expose the declarant to criminal liability is not
admissible unless corroborating circumstances
clearly indicate the trustworthiness of the statement. 
What corroborating circumstances do you offer?
 
          Counsel:                I don’t have any.

Thus, appellant presented no argument or evidence to the trial court supporting the
second criterion of rule 803(24), concerning the trustworthiness of the statement. See
id. Accordingly, we hold that the trial court did not abuse its discretion in sustaining
the State’s objection to and excluding Broderick’s testimony concerning Walls’
alleged statement against interest.
          We overrule appellant’s fourth point of error.
Sufficiency of the Evidence
          In his fifth and sixth points of error, appellant contends that the evidence was
legally and factually insufficient to support the jury’s verdict because the State failed
to prove that appellant intended to cause the deaths of the complainants.
          As part of his legal and factual sufficiency points, appellant argues that, in our
review of the sufficiency of the evidence, we must apply the reasoning of the Texas
Supreme Court concerning the proper deference to be accorded a fact finder’s
resolution of disputed facts “in order to harmonize civil and criminal jurisprudence.” 
Appellant directs us to In re J.F.C., 96 S.W.3d 256 (Tex. 2002), and in In re C.H., 89
S.W.3d 17 (Tex. 2002), both of which involved the review of the sufficiency of the
evidence presented in parental termination proceedings, in which the burden of proof
requires “clear and convincing” evidence. See In re J.F.C., 96 S.W.3d at 266 (legal
sufficiency); In re C.H., 89 S.W.3d at 26 (factual sufficiency). Appellant relies on
these cases in support of his assertion that, “it would appear that, as the consequences
of the factfinder’s decision increase, the deference to be accorded the finder of fact
should be reduced and the breadth and level of inquiry increased.” We disagree with
appellant’s characterization of the effect of the holdings of these cases, and we apply
the standards of review articulated by the Court of Criminal Appeals for reviewing
the legal and factual sufficiency of the evidence.
          In conducting a legal sufficiency review, we view all of the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In conducting a factual
sufficiency review, we view all of the evidence neutrally, not in the light most
favorable to the verdict, and we will set aside the verdict “only if the evidence is so
weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence
is so strong that the standard of proof beyond a reasonable doubt could not have been
met.” Escamilla v. State, No. 74494, 2004 WL 1462077, at *1 (Tex. Crim. App. June
30, 2004); see Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). Under both
a legal and a factual sufficiency review, we may not substitute our own judgment for
that of the fact finder. Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). 
The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and
the weight to be given to the witnesses’ testimony, and it may believe all, some, or
none of any witness’s testimony. See Johnson, 23 S.W.3d at 7; Jaggers v. State, 125
S.W.3d 661, 672 (Tex App.—Houston [1st Dist.] 2003, no pet.).
           A person commits the offense of capital murder if, while in the course of
committing a robbery, he intentionally or knowingly causes the death of another
person. See Tex. Pen. Code Ann. §§ 19.02(b)(1), 19.03(a)(2) (Vernon 2003 & Supp.
2004-2005). Here, the charge authorized the jury to find appellant guilty if they
found, beyond a reasonable doubt, that he was a principal or a party to the offense of
capital murder. See id. § 7.02(a)(2) (Vernon 2003). Appellant concedes that his own
trial testimony was legally sufficient to establish that he was guilty, as a party, to the
aggravated robbery of the video store. However, appellant argues that the evidence
was legally insufficient to support the verdict that he is guilty of capital murder
“because the State failed to prove that [appellant] had the intent to cause the deaths
of the complainants.” Although appellant argues generally that, in connection with
his testimony that he and Walls had planned simply to rob the video store while
appellant remained outside of the manager’s office, “the physical facts at the crime
scene creates [sic] a reasonable doubt as to the sufficiency of the evidence to sustain
[appellant’s] conviction for capital murder,” he directs us to no specific physical
evidence that supports his argument.
          We note that, at trial, it was undisputed that appellant and Walls had planned
the robbery of the video store and, as part of their plan, had taken a handgun to the
store. It was similarly undisputed that the complainants were fatally shot with the
handgun during the robbery of the video store. The jury also heard a recorded
statement by appellant in which he admitted that he had shot and killed the
complainants after he heard Sanchez say that she was going to call the police and
report the robbery. Moreover, the evidence also included testimony that a video
surveillance tape was stolen during the robbery and that appellant had lied to the
police officers about its whereabouts. Based on the record presented, we hold that
the jury reasonably could have concluded that appellant killed the complainants
during the robbery in an effort to prevent them from identifying him to police.
          Viewing all of the evidence in the light most favorable to the verdict, we hold
that the jury reasonably could have found all of the essential elements of the offense
of capital murder beyond a reasonable doubt. See King, 29 S.W.3d at 562. 
Accordingly, we further hold that the evidence was legally sufficient to support the
jury’s verdict, and we overrule appellant’s fifth point of error.
          In regard to his factual sufficiency challenge, appellant reiterates his argument
that the “physical facts at the crime scene creates [sic] a reasonable doubt as to the
sufficiency of the evidence to sustain [appellant’s] conviction for capital murder.” 
Again, he directs us to no specific physical evidence that supports his argument.
          In his defense, appellant contested the voluntariness of his statement to the
investigating officers, and he testified that his statements were the result of coercion
and threats and were untrue with respect to whether he had shot the complainants. 
The investigating officers testified that appellant was never threatened or coerced and
that he appeared to understand and to voluntarily waive his rights to refuse to give a
statement and to request that an attorney be present. The resolution of this conflicting
testimony was, in this respect, solely within the fact-finding purview of the jury, as
the exclusive judges of the facts, the credibility of the witnesses, and the weight to be
given to the witnesses’ testimony. Johnson, 23 S.W.3d at 7; Jaggers, 125 S.W.3d at
672. In conducting our review, we may not substitute our own judgment for that of
the jury. Jones, 944 S.W.2d at 648.
          Viewing all of the evidence neutrally, we hold that the evidence was not so
weak as to render the verdict “clearly wrong and manifestly unjust” and that the
contrary evidence was not “so strong that the standard of proof beyond a reasonable
doubt could not have been met.” Escamilla, 2004 WL 1462077, at *1. Accordingly,
we further hold that the evidence was factually sufficient to support the jury’s verdict,
and we overrule appellant’s sixth point of error.
 

Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Bland.

Do not publish. Tex. R. App. P. 47.2(b).