Opinion issued March 24, 2005



















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00192-CR
____________

WALLACE BERLON CLARK, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 939690
 

 
 
MEMORANDUM OPINION
          A jury found appellant, Wallace Berlon Clark, guilty of the offense of felony
murder


 and assessed his punishment at confinement for 30 years. In six points of
error, appellant contends that the evidence was legally and factually insufficient to
support his conviction and that the trial court erred in preventing him from
questioning a police officer as to appellant’s custodial status and in admitting
appellant’s oral statements into evidence. We affirm.
Facts 
          Pasadena Police Officer B. Dudley testified that, at about 8:12 a.m. on February
16, 2003, he was dispatched to a stabbing that had occurred at 1710½ Palmwood in
a trailer located in the backyard of a house. Upon arrival, he saw three butcher
knives, one of which was bloody, laying in the yard between the trailer and the house. 
He also saw scuff marks on the trailer’s front door and saw that the door jamb and air
conditioning vent cover inside the trailer had been damaged. He then saw the
complainant, Anthony Harless, lying on his back in the trailer’s hallway, drifting in
and out of consciousness, and holding his hands over his abdominal wounds. Dudley
then spoke with several people, who gave him appellant’s name and description. 
When Dudley first saw appellant, appellant was visibly upset, had blood on his face,
and was wearing a bloody, torn shirt. Before appellant was taken to a hospital, he
spontaneously told Dudley that he had acted in self-defense because the complainant
had “kicked [his] ass” and that “he was angry with the victim because he had been
beaten up and he was going to defend himself with a knife.” 
          Pasadena Police Officer S. Jones testified that, while at the hospital with
appellant, appellant asked, “If I get the shit kicked out of me by a guy and I leave and
go get a knife, if I come back and stab him, is that self-defense?” Jones told him that
it would not be self-defense. Jones explained that appellant had not asked the
question in response to anything that Jones had said.
          Bradley Baton, a friend of the complainant, testified that, at about 8:30 p.m. on
February 15, 2003, he arrived at the complainant’s trailer to repair the complainant’s
computer. Later that evening, appellant, whom Baton had known for about six
weeks, came to the trailer, argued with the complainant, and then left. Soon
thereafter, appellant returned to the trailer, but the complainant told him to leave, and
appellant left again. Throughout the night, appellant kept returning to the trailer and
banging on the door, but no one would let him inside. Then next morning, after
someone let appellant inside the trailer, appellant yelled for the complainant, who
emerged from his bedroom and again told appellant to leave. Appellant and the
complainant then started fighting. After Baton pulled appellant off of the
complainant, appellant grabbed a nearby lamp but then put down the lamp and left the
trailer. Baton, the complainant, and Barbara Stark, the complainant’s girlfriend, went
back to the complainant’s bedroom. Two to four minutes later, Baton heard appellant
banging on the trailer’s front door and then heard the door “pop open.” The
complainant got up off of the bed, met appellant at the bedroom door, and the two
men began fighting again. Julie Harless, the complainant’s sister, and James Moore,
Harless’s boyfriend, had followed appellant into the trailer, and Harless was yelling,
“He stabbed Tony, you stabbed my brother.” After Moore pulled appellant off of the
complainant, who was lying on his back and holding his intestines, Baton saw that
the complainant had two wounds on his body. During cross-examination, Baton
testified that he had heard that the two men had argued in the past. He also explained
that he knew that the complainant had sold narcotics. 
          Harless testified that she and appellant had been friends for seven years and,
at the time of the incident, had been allowing both him and his girlfriend to live in her
house at 1710 Palmwood. On February 16, 2003, at about 3:00 a.m., she and Moore
returned to her house and went to sleep. Later, she was awakened by appellant, who
was yelling that “he was going to stab that son of a bitch and kill that mother fucker.” 
She ran to the kitchen, where she saw appellant, who appeared angry, take two knives
out of her kitchen drawer. As she watched from the kitchen window, he then ran out
of the house’s back door to the trailer and kicked open the trailer’s door. The
complainant came to the trailer’s door, and appellant, with the knives in his hands,
“lunged” toward the complainant. Harless then ran to the trailer, where she saw
appellant on top of the complainant. She also saw the “two knives . . . laying on the
ground in front of the doorway,” picked them up, and “threw them off, out of the
porch.” She then heard the complainant say, “He stabbed me.” Moore pulled
appellant off of the complainant, and Harless called for emergency assistance. Before
assistance arrived, appellant told Harless that “it was an accident, he didn’t mean to
do it.” 
          James Moore testified that he and Harless returned to Harless’s house at about
7:00 a.m. because they had received a telephone call that “problems were going on
with some people,” and, from a back bedroom, Moore heard appellant screaming,
“I’m going to kill him, I’m going to kill him.” Appellant went to the knife drawer in
the kitchen, left the house, kicked open the trailer’s door, and Moore then saw the
complainant and appellant “colliding together out there.” Moore entered the trailer,
saw appellant on top of the complainant, removed appellant from the complainant,
and saw that the complainant had been stabbed in the stomach. On cross-examination, he testified that he and Harless had been smoking crack cocaine at their
friends’ house the night before the complainant was stabbed and that he and Harless
smoked crack cocaine frequently. 
          Dr. R. Nilton, a Harris County medical examiner, testified that, in his opinion,
the cause of the complainant’s death was a stab wound to the abdomen. Nilton
explained that, after performing the complainant’s autopsy, Nilton found that the
complainant had a stab wound to the right side of his abdomen, had a cutting wound
on the upper-middle portion of his abdomen, and had bruises and lacerations on his
face, chest, and hands. Nilton noted that the stab wound was six-and-a-half inches
deep and was a “deep, deliberate injury.” 
          Barbara Stark testified that, some time during the night, she and the
complainant left the trailer to visit some friends and returned the next morning. When
they returned, appellant was already inside the trailer, but the complainant told him
to leave, and the two men began fighting. Stark explained that she had gone into the
trailer’s bedroom, so she did not see the fight. About 15 minutes later, the
complainant joined her in the bedroom. Two minutes later, Stark heard appellant
beating at the trailer’s front door. The complainant left the bedroom, and, the next
thing she saw was the complainant falling into the bedroom with appellant on top of
him. Stark also explained that, after appellant entered the trailer, she heard appellant
say, “I’m going to kill him.” 
          Appellant testified that, at around 11:30 p.m. on February 15, 2003, he called
the complainant, from whom he purchased narcotics on a daily basis, to purchase
crack cocaine. Appellant and the complainant met in the yard between the house and
the trailer, and appellant gave the complainant 10 dollars. Because the complainant
did not have any cocaine with him, he went back to his trailer, and, 10 minutes later,
returned to the yard with the cocaine. However, before he could give the cocaine to
appellant, the complainant bumped his hand against a lawn mower, and the cocaine
fell to the ground, scattering “white rocks everywhere.” The complainant said, “Good
luck,” and left. Twenty minutes later, appellant called Harless to tell her that the
complainant had dropped the cocaine and had ripped him off, and Harless told him
that she would take care of the situation when she returned. Later, appellant saw
Dave Sumner, a man for whom appellant knew the complainant sold narcotics, at the
trailer, and appellant went over to the trailer to speak with him. However, the
complainant would not let him inside, so appellant returned to the house. Appellant
called Sumner, who told him to come back to the trailer, and appellant returned to the
trailer, but, again, the complainant told him to leave. Appellant returned to the house,
where he remained until the morning. 
          Appellant further testified that, at around 7:30 a.m., after he told Harless that
he had not received his money back from the complainant, Harless told him to go get
his money. He went to the trailer and was let inside by Billy Lewis, one of his
friends, but the complainant came out of his bedroom, told appellant to leave, and
shoved appellant’s face into a wooden podium. The complainant and Lewis then
started “assaulting” him. After appellant was pulled away from the complainant,
appellant grabbed a lamp, but someone took it away from him and threw him out of
the trailer. 
          Appellant explained that, at the time, he was angry, scared, and thought that
“they” were going to kill him but that he “wanted his money back” and “didn’t think
it was right . . . they beat on [him] like that.” Therefore, he went back to the house,
got two knives from the kitchen, and returned to the trailer. He explained that he got
two knives because he “knew [he] would not be able to defend [himself] with [his]
bare hands. So, if [the complainant] was going to assault [him], [he] wanted to be
prepared to defend himself.” He further explained that he and the complainant had
physically fought once before, that he knew that the complainant kept a collection of
swords and daggers, and that he had once seen the complainant chase a man with a
sword. With the knives in his hands, he went to the trailer and kicked open the door. 
The complainant met appellant at the trailer’s door and kicked appellant in the chest,
but appellant, still with the knives in his left hand, grabbed the complainant’s foot,
causing the complainant to fall on top of appellant. Appellant then dropped the
knives. The complainant pulled him into the trailer, and appellant fell on top of him.
Stark and Baton eventually separated appellant and the complainant, and appellant
went outside. Appellant explained that he had not realized that the complainant had
been stabbed until Harless came outside and told him that he had stabbed the
complainant. Appellant told her that it was an accident. He stated that he did not
“lunge” at the complainant with the knives and that he did not go to the trailer
intending to kill or stab the complainant. He explained again that he “just wanted his
money back.”
          In its rebuttal case, the State presented the testimony of Pasadena Police Officer
J. Bell, who stated that, after he informed appellant of his legal rights,


 appellant
signed a waiver form, which provided that appellant understood that he was waiving
certain rights. Bell then conducted a videotaped interview with appellant, who stated
that he was “humiliated and mad,” that he “didn’t care about the 10 dollars,” that the
complainant beat him up, and that he “had revenge on his mind.” The videotaped
interview was offered and admitted into evidence. 
Sufficiency of the Evidence
          In his first and second points of error, appellant argues that the evidence was
legally and factually insufficient to support his conviction because the State failed to
prove that appellant intended to commit, committed, or attempted to commit the
underlying offense of burglary of a habitation. In his third and fourth points of error,
appellant argues that the evidence was legally and factually insufficient to support his
conviction because “the act causing the complainant’s death was not done in the
course and furtherance of the burglary of [the complainant’s] habitation.”
          Appellant requests that we reconsider “the deference to be accorded the fact
finder in analyzing legal sufficiency” based on In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002), where the Texas Supreme Court noted that “a court should disregard all
evidence that a reasonable factfinder could have disbelieved or found to be
incredible.” However, it is well-settled that we review the legal sufficiency of the
evidence by viewing the evidence in the light most favorable to the verdict to
determine if any rational fact finder could have found the essential elements of the
offense beyond a reasonable doubt. King v. State, 29 S.W.3d 556, 562 (Tex. Crim.
App. 2000). In a legal sufficiency review, we may not substitute our own judgment
for that of the fact finder. Id. In our review of the factual sufficiency of the evidence,
we view all of the evidence neutrally, not in the light most favorable to the verdict,
and we will set aside the verdict “only if the evidence is so weak that the verdict is
clearly wrong and manifestly unjust, or the contrary evidence is so strong that the
standard of proof beyond a reasonable doubt could not have been met.” Escamilla
v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004), petition for cert. filed, Dec.
20, 2004, No. 04-7807 (citing Zuniga v. State, 144 S.W.3d 477, 483 (Tex. Crim. App.
2004)); see Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). Although our
analysis considers all the evidence presented at trial, we note that the trier of fact is
the exclusive judge of the facts, the credibility of the witnesses, and the weight to be
given to their testimony. Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App.
1986). Unless the available record clearly reveals that a different result is
appropriate, an appellate court must defer to the jury’s determination concerning what
weight to give contradictory testimonial evidence because this resolution often turns
on an evaluation of the credibility and demeanor of the witnesses, and the jurors were
in attendance when the testimony was delivered. Johnson, 23 S.W.3d at 8.
          A person commits the offense of felony murder 
if he commits or attempts to commit a felony, other than manslaughter,
and in the course of and in furtherance of the commission or attempt, or
in immediate flight from the commission or attempt, he commits or
attempts to commit an act clearly dangerous to human life that causes
the death of an individual.
 
Tex. Pen. Code Ann. § 19.02(b)(3) (Vernon 2003). The felony murder doctrine
dispenses with the necessity of proving the mens rea accompanying the homicide
itself; the underlying felony supplies the culpable mental state. Johnson v. State, 4
S.W.3d 254, 255 (Tex. Crim. App. 1999).
          The underlying offense alleged in this case was burglary of a habitation. A
person commits the offense of burglary of a habitation if, without the effective
consent of the owner, the person (1) enters a habitation, or a building not then open
to the public, with intent to commit a felony, theft, or an assault, or (2) enters a
building or habitation and commits or attempts to commit a felony, theft, or an
assault.


 Tex. Pen. Code Ann. § 30.02(a)(1), (3) (Vernon 2003). 
Estoppel
          In this case, appellant was charged by indictment with the offense of capital
murder. Appellant requested and received a charge on the lesser-included offense of
felony murder. Although the trial court charged the jury with both offenses, the jury
found appellant guilty only of the offense of felony murder. Citing to State v. Yount,
853 S.W.2d 6, 9 (Tex. Crim. App. 1993), the State argues that, because “[a]ppellant
benefit[t]ed from his request to include felony murder in the charge,” he is “estopped
from complaining on appeal that the evidence is legally and factually insufficient.” 
We have held that a defendant is estopped from challenging the legal sufficiency of
the evidence to support his conviction for a lesser-included offense where the
defendant requested a charge on the lesser-included offense and received the benefit
of such instruction. McKinney v. State, 2005 WL 327145, at *3-5 (Tex.
App.—Houston [1st Dist.] Feb. 10, 2005, no pet. h.). However, we have also held
that a defendant is not estopped from challenging the factual sufficiency of the
evidence supporting a lesser-included offense on which he requested a jury charge. 
Id. at 4-5. Therefore, here, because appellant was convicted of the lesser-included
offense of felony murder, we hold that appellant is estopped from challenging the
legal sufficiency of the evidence showing the elements of the offense of felony
murder. However, we further hold that appellant is not estopped from challenging
the factual sufficiency of the evidence. 
          We overrule appellant’s first and third points of error
Burglary of a Habitation
           In furtherance of his argument that the evidence was factually insufficient to
prove that, when appellant entered the complainant’s trailer, appellant intended to
commit, committed, or attempted to commit an assault, appellant notes that he
testified that (1) he returned to the complainant’s trailer only to get his money back
from the failed narcotics transaction and did not intend to kill or stab the complainant;
(2) the knives he carried were intended only for protection because the complainant
had assaulted appellant earlier and because appellant knew that the complainant kept
a sword in the trailer; (3) because he knew that the complainant sold narcotics for
Sumner, whom appellant saw at the trailer, appellant assumed he would be able to get
the money from Sumner; (4)“the parties were grabbing and kicking one another when
they fell to the ground”; (5) he did not immediately realize that the complainant had
been stabbed, and (6) he told Julie Harless on multiple occasions that “it was an
accident.” Furthermore, appellant notes that (1) Harless testified that appellant
repeatedly told her that “the incident was an accident” and that “he did not mean to
do it”; (2) Bradley Baton testified that the complainant “jumped up and went to
confront the [a]ppellant after he kicked in the trailer door”; (3) James Moore
“confirmed that as the [a]ppellant made a motion to go into the trailer [the
complainant] came towards the [a]ppellant” and also “testified that the parties
collided, not that the [a]ppellant coldly stabbed the complainant”; (4) none of
witnesses testified that they actually saw appellant stab the complainant; and
(5) Barbara Stark testified that she did not see appellant grab the complainant.
          Finally, appellant notes that (1) the testimony of Baton, Stark, Moore, and
Harless “is discredited by their multiple criminal convictions, lifestyles, friendship
with the complainant, and immediate prior drug usage”; (2) several witnesses testified
that appellant did not receive the narcotics for which he paid 10 dollars; (3) “the
State’s drug savvy witnesses” substantiated appellant’s claim that appellant “returned
to the trailer to get his money back from Sumner” and “not to stab or kill” the
complainant; and (4) the “testimony by the State’s witnesses does not refute, and
largely supports the [a]ppellant’s testimony that [the complainant] was injured when
he fell on the [a]ppellant after they collided.” 
          Here, there is ample evidence that appellant entered the complainant’s
residence and intended to commit, committed, or attempted to commit a felony or an
assault. Appellant testified that, because he was angry and “wanted his money back”
from the complainant, he went back to the house after being thrown out of the trailer,
got two knives from the kitchen drawer, and returned to the trailer. He further
testified that he kicked open the trailer’s door while holding the knives in his hands. 
An examination of the evidence shows that the knives were butcher-type knives, with
blades over seven inches long. Julie Harless testified that, after she heard appellant
yell that “he was going to stab that son of a bitch and kill that mother fucker,” she saw
appellant take two knives out of her kitchen drawer, walk across the yard to the
trailer, and kick open the trailer’s door while he was holding the knives in his hands. 
Harless further testified that she saw appellant lunge at the complainant while
appellant was holding the knives and that, after she entered the trailer, she saw
appellant on top of the complainant and heard the complainant say, “He stabbed me.” 
James Moore testified that he heard appellant yell, “I’m going to kill him,” that he
saw appellant kick open the trailer door, and that he saw appellant and the
complainant “colliding together.” Barbara Stark testified that she heard appellant
beating at the trailer’s door, that she saw appellant fall on top of the complainant, and
that she heard appellant say, “I’m going to kill him.” Bradley Baton testified that,
when Moore pulled appellant off of the complainant, the complainant was lying on
his back on the floor and was holding his stomach. Officer Dudley testified that
appellant told him that “he was angry with the victim because [appellant] had been
beaten up and he was going to defend himself with a knife.” Officer Jones testified
that appellant asked him, “If I get the shit kicked out of me by a guy and I leave and
go get a knife, if I come back and stab him, is that self-defense?” Officer Bell
testified that, during the videotaped interview, appellant told him that he was
“humiliated and mad,” that he “didn’t care about the 10 dollars,” and that he “had
revenge on his mind.” Dr. Nilton testified that the complainant died from a stab
wound to his abdomen and that the wound was six and one-half inches deep. 
          Considering this evidence, as the exclusive judges of the facts, the credibility
of the witnesses, and the weight to be given their testimony, the jury was free to
believe or disbelieve all or any part of the State’s witnesses’ or appellant’s testimony. 
McKinny v. State, 76 S.W.3d 463, 468-69 (Tex. App.—Houston [1st Dist.] 2002, no
pet.). Viewing all of this evidence neutrally, we conclude that the evidence was not
so weak that the verdict was clearly wrong or manifestly unjust and that the contrary
evidence was not so strong that the standard of proof beyond a reasonable doubt
could not have been met. Accordingly, we hold that the evidence was factually
sufficient to support the jury’s finding that appellant committed the underlying felony
of burglary of a habitation. 
          We overrule appellant’s second point of error.
Act “in the Course of and in Furtherance of” the Underlying Offense
          In support of his argument that the evidence was factually insufficient to
support his conviction because “the act causing the complainant’s death was not done
in the course and furtherance of the burglary of [the complainant’s] habitation,”
appellant asserts that (1) Baton, Stark, and Harless did not see appellant actually stab
the complainant; (2) the complainant was a violent, aggressive person who threatened
people with a sword; (3) Baton and Moore testified that the complainant came toward
appellant after appellant kicked open the trailer’s door; (4) Moore testified, and Stark
confirmed, that appellant and the complainant “collided”; (5) appellant testified that
the complainant confronted him, that they fell into the trailer together, and that the
complainant “was hurt only when he fell on top of the [a]ppellant”; and (6) appellant
“later described the complainant’s death as an accident,” which “the State’s evidence
did not negate.” Furthermore, appellant notes that (1) he “did not cause the death as
a result of a purposeful act committed with the requisite intent”; and (2) because the
State’s witnesses testified that they did not see appellant stab appellant, such
testimony “confirms the [a]ppellant’s contention that [the complainant] fell on the
[a]ppellant’s knife after they collided.”
          Here, again, there is ample evidence that the acts that caused the complainant’s
death occurred in the course of and in furtherance of the commission of the
underlying offense of burglary of the complainant’s residence. Appellant testified
that he “just wanted his money back” from the complainant, and, at the time of the
incident, he was angry, scared, and “didn’t think it was right . . . [that] they beat on
[him] like that.” Both Harless and appellant testified that appellant, while holding
two knives, kicked opened the trailer’s door. Harless further testified that appellant,
with the knives in his hands, “lunged” at the complainant. Baton testified that, after
appellant kicked open the door, the complainant and appellant began fighting. Baton
and Moore testified that, after Moore removed appellant from on top of the
complainant and ended the fight, the complainant was lying on his back on the floor,
was holding his abdomen, and had visible wounds on his body. Dr. Nilton, the
medical examiner, testified that the stab wound in the complainant’s abdomen was
six and one-half inches deep. We note that appellant’s statements that he did not
mean to stab the complainant and that he did not intend to kill the complainant do not
render the evidence insufficient to prove that the appellant’s acts causing the
complainant’s death were done in the course and furtherance of the offense of
burglary of a habitation. Absent appellant’s act of holding two butcher knives in his
hands during a fight with the complainant inside the trailer, the complainant would
not have been “accidentally” stabbed in the abdomen. 
          Considering this evidence, again, as the exclusive judges of the facts, the
credibility of the witnesses, and the weight to be given their testimony, the jury was
free to believe or disbelieve all or any part of the State’s witnesses’ testimony or
appellant’s testimony. McKinny, 76 S.W.3d at 468-69. Viewing all of this evidence
neutrally, we conclude that the evidence was not so weak that the verdict was clearly
wrong or manifestly unjust and that the contrary evidence was not so strong that the
standard of proof beyond a reasonable doubt could not have been met. Accordingly,
we hold that the evidence was factually sufficient to support the jury’s finding that
appellant committed an act clearly dangerous to human life in the course of and in
furtherance of the commission of the offense of burglary of a habitation that caused
the complainant’s death.
          We overrule appellant’s fourth point of error. 
Custodial Interrogation
          In his fifth and sixth points of error, appellant argues that the trial court denied
appellant due process of law


 and the protections provided by Code of Criminal
Procedure articles 38.22, section 3,


 and 38.23


 because it prohibited appellant “from
ascertaining [his custodial] status during questioning Officer Dudley and thereafter
admitting those statements after timely request and objection.” Citing to Texas Rules
of Evidence 103(a)


 and 104,


 appellant notes that his “initial request to take Dudley
on voir dire to determine the [a]ppellant’s custodial status was appropriate.” 
Furthermore, appellant contends that the “custodial status of an accused is an
essential threshold issue in determining the voluntariness and admissibility of any
subsequent statement” and that “[d]enying [his] request to ask Dudley questions about
the [a]ppellant’s custodial status deprived him of challenging the subsequent
testimony at trial and on appeal.”
          At trial, Officer Dudley testified as follows:
          [State]:                             And at that time, did you question him or
anything of that nature?
 
          [Officer Dudley]:             When I made– 
          [State]:                             The answer is yes or no.
          [Dudley]:                         Yes, we did.
          [State]:                             Okay. My question, though, did he ever make
any statements to you-all that were
unsolicited, that you didn’t ask for?
 
          [Dudley]:                         Right. He made spontaneous statements.
 
          [State]:                             That’s what I’m talking about. What
statements did he make that y’all were not
questioning him at the time, that didn’t have
anything to do with other than keeping– 
 
          [Appellant’s counsel]:     May I take the witness on voir dire before he
answers that question? I object to him–
 
          [Trial court]:                    You may object.
          [Appellant’s counsel]:     I object to him answering the question at this
point in time. We haven’t established the
status of [appellant] at the time these
statements were made.
 
          [Trial court]:                    That will be overruled. Listen to the question. 
Answer just that question.
 
          [Dudley]:                         Yes, sir.
  
          [State]:                             I’m saying, was he ever seated in that lawn
chair where you told him to sit down—and he
complied; is that correct?
 
          [Dudley]:                         Yes, sir.
 
          [State]:                             Did he ever make any statements that you-all
did not ask?
 
          [Dudley]:                         Yes, sir.
 
          [State]:                             He started talking?
 
          [Dudley]:                         He made statements prior to us asking him
questions.
 
          [State]:                             Now, was that in response to any question
that you-all asked.
 
          [Dudley]:                         No.
 
          [State]:                             Okay. What did he tell you about something
happening to him?
 
          [Dudley]:                         The first thing he said is it was self-defense. 
And then he said he kicked my ass, and I was
just defending myself.
 
          . . . 
                    
          [State]:                             Okay. Now again, unresponsive or
unsolicited statements, did he ever make
another statement about defending himself? 
 
          [Dudley]:                         Yes, sir, he did.
          [State]:                             And what was that?
          [Dudley]:                         Told me that he was angry with the victim
because he had been beaten up and he was
going to defend himself with a knife. 
 
          Article 38.22 sets out certain requirements for admitting an accused’s oral and
written statements when those statements are made as a result of a custodial
interrogation. See Tex. Code Crim. Proc. Ann. art. 38.22. (Vernon 1979 & Supp.
2004-2005). A statement that does not stem from custodial interrogation does not
have to meet the requirements of article 38.22. Id. art. 38.22, § 5 (Vernon 1979)
(noting that nothing in the article “precludes admission of . . . a statement that does
not stem from custodial interrogation”). Custodial interrogation occurs when a
defendant is in custody and exposed “to any words or actions on the part of police
. . . that [the police] should know are reasonably likely to elicit an incriminating
response.” Roquemore v. State, 60 S.W.3d 862, 868 (Tex. Crim. App. 2001) (citing
Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1689-90 (1980)). 
          In this case, the State concedes that appellant was in custody at the time he
made the statements to Officer Dudley. However, to exclude statements under article
38.22, appellant must also have been subjected to interrogation. See Tex. Code
Crim. Proc. Ann. art. 38.22, § 5. Therefore, the issue becomes whether Officer
Dudley interrogated appellant. Here, the record shows that appellant’s statements to
Dudley were not the product of custodial interrogation. Rather, the record shows that
appellant made unsolicited, spontaneous statements that he “was just defending
myself” and that “he was angry with the victim because he had been beaten up and
he was going to defend himself with a knife.” Furthermore, because the record shows
that appellant was not subjected to interrogation when he made the statements, such
statements were not obtained in violation of federal or state law and, therefore, were
otherwise admissible at appellant’s trial as admissions by a party opponent. See id.
art. 38.23(a) (Vernon Supp. 2004-2005); Tex. R. Evid. 801(e)(2). Thus, we hold that
the trial court did not err in overruling appellant’s objection concerning appellant’s
status at the time he made the statements to Officer Dudley. 
          We overrule appellant’s fifth and sixth points of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Alcala.
Do not publish. Tex. R. App. P. 47.2(b).